469 So.2d 533 (1985)
NATIONWIDE MUTUAL INSURANCE CO.
v.
Henry Gerrard CLAY.
82-536, 82-917.
Supreme Court of Alabama.
February 8, 1985.
As Modified on Denial of Rehearing April 5, 1985.
*534 Bert S. Nettles and James H. McDonald, Jr., Mobile, for appellant.
Fred W. Killion, Jr. and Patricia K. Olney of Reams, Wood, Vollmer, Philips, Killion & Brooks, Mobile, for appellee.
Edgar M. Elliott, III and Karon O. Bowdre of Rives & Peterson, Birmingham, James T. Upchurch III of Rushton, Stakely, Johnston & Garrett, Montgomery, amicus curiae, for State Farm Mut. Auto. Ins. Co.
Stephen D. Heninger of Hare, Wynn, Newell & Newton, Birmingham, for amicus curiae The Alabama Trial Lawyers Assn.
ALMON, Justice.
These consolidated appeals involve a claim for bad faith failure to pay a claim on a disability insurance policy. At trial, the court granted a directed verdict for the plaintiff insured in the amount of $46,165.00 on the contract count. The jury returned a verdict for the plaintiff in the amount of $1,250,000.00 on the bad faith count. The trial court denied the defendant insurance company's post-trial motions, and the company appeals.

Facts
Because the issues turn on fact questions, we include the following detailed statement of facts. The facts are supported largely by the numerous exhibits, including memoranda of conversations from Nationwide's file on Clay's claim. Clay also kept notes of his telephone conversations and while testifying used them to refresh his memory.
Henry Gerrard Clay applied for a policy of disability insurance with Nationwide Mutual Insurance Company on December 8, 1976. Clay was a practicing attorney in Mobile, and he applied for this policy at the instigation of his friend Bill McDowell, who had previously sold him a hospitalization insurance policy with Nationwide. McDowell filled out the application as Clay gave him the information required.
Two answers on the application later gave rise to charges by Nationwide of misrepresentation: To the question, "What is your average earned monthly income?" *535 Clay answered, "$1,800." To the question, "Will the insurance applied for replace existing Disability Income Insurance ... owned by applicant?" Clay answered, "Yes," and stated the company and amount as "Paul Revere $400/month."
Clay went to the office of Dr. Herbert Allen on December 14, 1976, for a physical examination. Clay testified that he did not remember seeing the doctor, but thought he had only seen a nurse, who took a blood sample and some measurements. The report indicates Clay was having no problems with his eyes. Clay's disability giving rise to the instant lawsuit was cataracts, which were diagnosed on August 29, 1977.
Nationwide issued the disability income policy effective January 19, 1977, but because McDowell told the underwriting department that Clay should be rated a Class AAA risk instead of a Class A risk, the policy was not sent to Clay until this change was made and did not reach him until March.
In the meantime, Clay had called Paul Revere Insurance Company to cancel the disability policy he had with that company. A Paul Revere agent, Leon Adams, called on Clay to ask why he had cancelled his policy. Clay told Adams that he intended to buy a disability policy with Nationwide. Adams compared the Paul Revere contract with the Nationwide contract and offered Clay increased coverage with Paul Revere. As Adams testified, "I talked him into getting a lot more coverage." On February 4, 1977, Clay applied for disability insurance with Paul Revere in the amount of $2200 per month and a policy was issued on February 26. When he received the Nationwide policy in March, he tried to cancel it, but could not reach McDowell, who had been promoted. Clay allowed both policies to remain in effect, with premiums being paid on a monthly bank draft.
On April 29, 1977, Clay visited Dr. Charles Ivey Williamson for a checkup, complaining that he had had fever recently and was feeling tired and run down. Dr. Williamson conducted lab tests, which showed a possibility of a viral infection affecting Clay's liver, but nothing seriously abnormal. Dr. Williamson recommended a diet and rest. His records indicated that Clay did not complain to him at this time of eye problems.
Clay continued to run a fever and feel sick through the spring and summer. On August 29, he went to Dr. Edwin A. Ross, his optometrist, with whom he had regular checkups. Dr. Ross diagnosed cataracts, which had caused his vision to drop from 20/20 in each eye to 20/40 in the left eye and 20/50 in the right. Dr. Ross testified that Clay's cataracts were in such a position that they caused a severe loss of vision and could not be corrected with glasses. He also testified that the cataracts developed in a short period of time, unlike in older people[1] where they cause a gradual loss of vision. Dr. Ross recommended that Clay see an ophthalmologist. On September 7, 1977, Clay saw Dr. James M. Harrison, who confirmed that Clay had cataracts.
Clay closed his law office, referred his clients with active files to other attorneys, and stored his books, office equipment, and other items in a warehouse. On September 26, 1977, Clay filled out a disability claim to file with Nationwide. He stated that the symptoms first appeared "July, 1977 to August, 1977." Clay left blank the spaces on the form for "Monthly income" and "any other Companies with whom you may carry Accident & Sickness insurance." Dr. Harrison completed the attending physician's portion of the form, indicating that Clay was totally disabled from September 7, 1977, "until recovered from surgery," and that the symptoms appeared "gradually."
Nationwide received the claim form at its group claims office in Atlanta on October 3. That office forwarded the form to Nationwide's office in Columbus, Ohio, where it arrived on October 13, 1977. The claim was assigned to Jim Otey, a medical claims examiner, on October 20. On November *536 10, Clay called to inquire about the status of his claim and requested a reply by telephone. On November 11, he called again. The message in Nationwide's file on Clay's claim includes the notation, "Please Call Today." Nationwide did not return either call.
Clay telephoned twice on November 14, and talked to Otey. Clay testified that when he first called, Otey refused to find his file, saying, in Clay's words, "if he started doing it for me he would have to talk to anybody that had a claim anytime they wanted to talk to him." Otey denied that he ever refused to look for Clay's file. Clay testified that during this first conversation Otey told him he had seen the file, whereupon Clay asked if Nationwide was going to pay. Clay testified that Otey answered,
"`Naw, no decision's been made on it yet.' He said, `but I,' he said, `I can tell you right now' and he said, `cataracts are not a disability. They take at least two years to become disabling.' And he said, his exact words, he said, `there's no way I could be disabled with cataracts.'"
Clay called Otey again on the afternoon of November 14, at which time Clay mentioned to Otey that Dr. Ross had first diagnosed his cataracts. Otey responded that Dr. Ross, instead of Dr. Harrison, would have to file the attending physician's report. Someone at Nationwide had initially told Clay that he should have Dr. Harrison fill out the claim form because Dr. Harrison was a medical doctor and Dr. Ross was not. Otey told Clay that the doctor who originally discovered the cataracts would have to send a statement.
Otey examined the file in detail on November 15. He was concerned whether Clay's cataracts existed prior to the policy coverage, although he had seen the report from Dr. Allen showing Clay had no eye problems on December 14, 1976. Otey had Equifax Services arrange for another doctor to examine Clay. Dr. Dan Rencher, an ophthalmologist, examined Clay on November 21, and sent a report to Equifax on November 23. Dr. Ross also sent a form to Nationwide on November 23 giving his diagnosis of cataracts.
Dr. Rencher's report stated:
"In my professional opinion there is in Mr. Clay's case the presence of some disability in that he is an attorney at law which necessitates that he read a considerable amount and he is experiencing difficulty doing so. It is my opinion that this disability is due solely to the cataracts."
Dr. Ross's report included the following:
(2A) When did symptoms first appear or accident happen? Date prior to 1977
 Aug 29,
(B) When did patient first consult you for this Condition? Date Aug 29, 1977
(C) Has patient ever had same
 or similar condition? If "Yes" state when and describe Yes [] No [√]
Neither of these reports clarified whether Clay's cataracts developed prior to the effective date of the coverage. Nationwide received Dr. Ross's report on December 1, 1977, but did not receive Dr. Rencher's report from Equifax until December 16. Otey denied to Clay that Dr. Rencher's report had been received, and later Equifax obtained another report, which stated that in Dr. Rencher's opinion Clay's "visual acuity constitutes a disability in his work as an attorney at law." Nationwide received this copy on January 4, 1978.
Other activity concerning Clay's file continued while these doctors' reports were proceeding. Bill McDowell, who had transferred to Nationwide's office in Birmingham since selling Clay his policy, testified that he saw Clay around Thanksgiving and that at that time Clay's vision was poor and he was keeping the house dark. McDowell talked to Otey on the telephone on November 30, 1977, and said Clay thought Nationwide was "trying to pull something." Otey denied at trial that McDowell had relayed this message, but his notes on the conversation *537 mention it, including the language just quoted. The notes also state that Otey "assured" (Otey's emphasis) McDowell "we had not even though in that way. Just routine handling as all cataracts were contestable. Exam was 11/21 and we should be getting report soon." Otey's notes conclude with an indication that McDowell responded "OKcarry on."
Clay talked to McDowell on December 2. He testified that McDowell said Otey would pay only when Clay set a date for an operation. Clay then telephoned Otey, who denied that he was waiting for an operation date and said that he was waiting for the report from Dr. Rencher. Clay said he would call Dr. Rencher to help speed up the report.
Clay telephoned McDowell again on December 5, at which time, as he testified, McDowell told him Otey though he was working and concealing income and had "made his own disability." When Clay called Otey to ask what he meant, Otey would not discuss it. Clay asked to talk to Otey's superior, but Otey said there was no one else he could talk to except in the legal department.
Clay talked to Otey and McDowell several more times, including once on December 21, when Otey stated that he was still waiting for Dr. Rencher's report, but would not go get the file. As noted above, Nationwide stamped Dr. Rencher's report "received" on December 16. Otey testified that Equifax, in forwarding the report, had not included the claim number, so placing it in the proper file took longer. Clay told Otey that Nationwide had selected Dr. Rencher, Clay had kept his appointment, Dr. Rencher had sent the report a month earlier, and Nationwide was making no effort to investigate.
Clay also complained that Nationwide was still deducting premiums from his checking account even though the policy had a waiver of premiums provision. Otey responded that the premiums would have to continue until he was satisfied of total disability and that company policy was that any premiums that should have been waived would be refunded later.
During this December 21 conversation, Clay continued to request that Otey get the file. Otey suggested that if Clay could give him the claim number, he might be able to retrieve the file. Clay sorted through his papers and, using a magnifying glass, read the claim number to Otey. Clay testified that Otey responded, "well, that proves you can read and we don't owe you any disability," and accused him of concealing income.
Otey also asked Clay if he had any other insurance. Clay's testimony about this exchange includes the following:
"I said, `listen you have had this claim here for three months to do it,' and I said, `listed on the application is a Paul Revere policy.' I said, `have you even called them or telephoned `em or written any letters to find out about that Paul Revere policy?' He said, `no, I'm talking about other policies. Something where you're concealing from us.' I said, `well, the only thing' I said, `I've got a little thing, insurance thing that I sent for the mortgage payments on my house.' ...
"... And he said, `I know about that.' His exact words, says, `I know about Paul Revere and the mortgage insurance with American Home.' He said, `do you mean to tell me you have no other disability insurance other than Paul Revere and American Home Mortgage Insurance?' I said, `that's right. I have no other insurance other than that; no other disability income insurance.'
"Q Did you have any other, please, sir?
"A No. No other disability income insurance. But I knew in the back of my mind that he didn't understand, that he was being a little bit misled but he was misleading himself. This isThree months had gone by and he hadn't even looked at the file other than to make accusations on the telephone."
On December 30, Clay called Otey, who said the claim had been turned over to the legal department. Around this time, Otey *538 took the file to John Harker, claims attorney for Nationwide. On January 13, 1978, Harker and Otey requested Nationwide's in-house doctor to review Clay's doctors' reportsthe file now included Dr. Harrison's report, Dr. Ross's report, and the two reports from Dr. Rencherand answer the question, "Noting the degree of sight he has in each eye, would an individual of this occupation be totally disabled?" The doctor returned the form on the same day with the notation, "Not completely and totally unable to perform his usual and customary occupation." Otey mentioned to Harker the probability of other insurance being involved. He testified that taking the claim to Harker effectively terminated his active involvement in handling the file.
On January 11, 1978, O.B. Carr, an insurance investigator with the Alabama Department of Insurance, sent a letter to Nationwide, which reads: "Please advise this department relative to disposition of referenced claim. Mr. Clay alleges to have been continuously totally disabled since September 7, 1977." Nationwide received this letter on January 16.
Also on January 16, Harker wrote Clay stating that Nationwide would not pay the claim. Harker testified that he disagreed with the in-house doctor's conclusion and believed Clay was totally disabled from practicing law. He based the denial of coverage on his conclusion that Clay's cataracts pre-existed the effective date of coverage. Harker's letter stated that Dr. Ross's report "indicates that although he did not treat you until August 29, 1977, symptoms of your condition began prior to 1977." (See the portion of Dr. Ross's report duplicated above.) The letter concluded with a statement that Nationwide would be "more than happy to review" any additional information from Clay and reconsider the claim.
Clay telephoned Harker on January 11, 17, and 18, but was told Harker was not in. He reached Harker on the morning of January 19th before receiving his mail. Harker told him of the letter tentatively denying coverage due to pre-existence of cataract symptoms. After Clay received the letter in the mail later that day, he called Harker back and accused him of intentionally misreading Dr. Ross's report. Harker told Clay he would immediately send a payment for one month's benefits and approve payment on the claim as soon as Dr. Ross confirmed that Clay did not have cataracts prior to 1977. Clay testified that he did not receive this first check until February 13.
In his notes on the conversation, Harker included a note to have Equifax inquire whether Clay had any other policies. In conducting an investigation, Equifax learned that Clay had not filed income tax returns for 1975, 1976, or 1977. Nationwide also learned that Clay had a $2200 Paul Revere policy that was a "make over" of the policy mentioned on Clay's application with Nationwide. Clay testified that he talked to Harker on January 31, 1978, and Harker said that if the Paul Revere policy was issued after the Nationwide policy, it wouldn't affect Clay's coverage with Nationwide, but that "they [Nationwide] would pay full coverage." Harker later received a letter from Paul Revere stating that their policy was a "new policy" issued in February 1977 as a make-over of his 1966 policy. When he talked to Clay on February 20, he said, according to Clay, that the Nationwide policy had been issued first. Based on this information, Clay agreed with Paul Revere to reduce his coverage from $2200 per month to $1250 per month with a one-year additional benefit of $150 per month.
During this period, the question of the onset of Clay's disability was settled to Harker's satisfaction. He did not talk to Dr. Ross the day after the January 19 conversation with Clay, but wrote a letter to Dr. Ross on February 7 asking for the date the cataracts appeared. Dr. Ross replied that there had been nothing abnormal when he had examined Clay on November 3, 1976, and no sign of "any significant impairment of visual acuityuntil the exam of August 29, 1977." Harker had instructed Otey to request "continuation of disability" statements from Clay and Dr. *539 Ross and include these forms with the check authorized on January 19, which Clay received on February 13. When Harker received the letter from Dr. Ross on February 23, he sent it to Otey with instructions to pay Clay's sickness disability income. Otey noticed that the "continuation of disability" forms were not in the file, initialed Dr. Ross's letter with a notation "Forms out," and held up the benefits.
On February 28, Nationwide received another letter from O.B. Carr of the Alabama Department of Insurance, referring to the unanswered January 11 letter and requesting Nationwide to advise the department as to the present status of Clay's claim. Harker responded on March 7, stating that he was unable to determine if Nationwide had received the first letter. He recited the history of Clay's application, claim, and the treatment thereof. The letter concluded, "At this time, we are awaiting only return of claim forms from Mr. Clay indicating disability and dates of treatment through the present. Immediately upon receipt of that information, we will be in a position to bring Mr. Clay's disability payments up to date."
When Clay received a copy of this letter on March 9, he called Harker and said there was a lot in the letter that was not true, particularly the statement that Nationwide was merely awaiting forms from Clay. Clay testified that the forms were not inclosed with the check. He said he complained to Harker, "[I]t's been one series of promises after another and you've never said anything about waiting on anything from me.... [E]very time that you say you'll pay as soon as you get a medical report you don't pay." Clay threatened to have the insurance department investigate or to sue, whereupon Harker said, according to Clay, "[I]f you file suit, you won't get a nickel for at least ten years."
Harker offered to send another one-month "good faith" payment of $1300, and Clay responded, "[A]bsolutely not ... either pay it up or deny the claim." Harker agreed to pay the benefits current to February 1, and Clay agreed to return a current medical report if Harker sent him a form along with the payment. Harker's notes on this conversation read:
"Pay another payment to Feb. 1, 1978. He will send forms. I don't believe we can justify a delay since his condition could not improve without surgery. Also suggest we send Equifax now to investigate if office is open."
An Equifax agent asked Clay on March 15 to release his income tax returns, which Clay refused to do. The agent called Otey to tell him this, and that Clay apparently had not filed a return for 1976. Also on March 15, Dr. Ross completed the continuation of disability forms and sent them to Nationwide. They were received on March 21.
On March 28, Harker wrote Clay:
"In investigating a claim which you have against the above indicated policy, it has come to our attention that there may be certain information which was withheld from us on the application; information which was necessary in determining the amount of disability insurance for which you would have been eligible under our company rules.
"Based on that fact, I find that we will need some proof of the income which you represented on your application in December, 1976. That is, at that time, you indicated you were averaging $1,800 per month. Information has come to our attention that you were making far less than that and as such, we will need proof of income.
"Although, as I am sure you are aware, you have no duty to provide us with income tax records[, a] copy of your tax return would effectively close the matter. Any other information you can provide showing income would be quite beneficial."
Harker testified that if Clay had not filed income tax returns, "there was a strong possibility in my mind that he had had no income.... If his income was less, it would have affected the policy as well based on the other insurance that he had."
*540 Clay testified that when he received this letter he called Harker and told him:
"I thought the only reason he'd asked for that is because Bill McDowell had told him I didn't have tax returns but that I did have ... that I kept good records in my office and I said it'd be fairly easy for me to verify my income for 1976 but... I did not believe him when he said it would close the matter.... I said, if there's anything that's come to your attention that's new and you have a reason to ask for the tax return, ... I will try to verify my income during 1976 just like you said. But, I said, without that, ... it's unreasonable for you to ask for it at this point; you've had six months to investigate it."
His testimony continued:
"Q What did he say, please?
"A Well he said that the company had discussed it and that was the position they were gonna take ... [b]ut he said he didn't think that he had to tell me the details of his investigation. So he wouldn't tell me why he wanted the income tax return."
On April 5, O.B. Carr again wrote Harker, stating that "Obviously, Mr. Clay is concerned over your change of plan." Harker wrote back, asking Carr to help Nationwide to persuade Clay to submit his income tax returns. Clay filed this suit on July 14, 1978.

Proceedings Below
Clay's original complaint, filed on July 14, 1978, sought damages in the amount of $100,000 for breach of contract. Nationwide answered with a general denial of the allegations of breach, stating that "at this time it has still not completed its investigation." Nationwide included with its answer a request for production of Clay's federal and state income tax returns and his hospital, doctor, and medical reports. When Clay did not respond, Nationwide filed a motion for the court to compel Clay to produce the documents. The court granted this motion on February 8, 1979, giving Clay 20 days to comply. When he did not, Nationwide filed on March 6 a motion styled "Motion for Default Judgment," which we take to be a motion to dismiss pursuant to Rule 37(b)(2)(C), A.R.Civ.P.
In response to this motion, Clay stated that he had not filed income tax returns for the years in question. He gave a deposition concerning these matters on May 30, 1979. The case was continued several times, and in March 1980, Clay's original counsel withdrew and his present counsel entered an appearance. The parties conducted further discovery and the court granted continuances until, on April 29, 1981, Clay filed his first amended complaint.
The amended complaint included three counts: one for bad faith "in failing and refusing to pay the plaintiff the benefits due under such policy and in continuing to require and accepting premiums for said policy;" a second count for fraud; and a third count for breach of contract. The first two counts each sought $1,500,000 in damages, and the third sought $150,000. This amendment came shortly after this Court recognized a cause of action against insurers for bad faith failure to pay a claim in Chavers v. National Security Fire & Cas. Co., 405 So.2d 1 (Ala.1981).
Nationwide sought discovery from Clay of documentation of Clay's income for 1970 through 1980. On May 8, 1981, Nationwide filed a motion to compel Clay to respond to these discovery requests. On January 28, 1982, Clay filed a motion to limit discovery. The court on February 5 granted the motion "to the extent that the Plaintiff shall at this time produce to the Defendant the amount of deposits to his attorney accounts during the period in question." Clay supplied a listing of deposits for the years 1969 through 1976. Approximately two weeks before trial, Clay provided records of his bank deposits for January through September of 1977.
On February 22, 1982, Clay filed a second amended complaint, which corrected some of the factual allegations. Nationwide filed an answer to this amended complaint (it had not answered the first amended *541 complaint), denying that it had acted in bad faith and stating that it received information in March 1978 which prevented the previously anticipated resolution of the claim. Clay filed a third amended complaint on April 23, 1982, amending the ad damnum clauses of each count to claim $3,000,000.
Nationwide's answer to the third amended complaint added defenses that Clay's earnings were insufficient to provide the benefits provided in the policy; that any benefits due were to be prorated with Clay's other disability income policies; that Clay had misrepresented his income in obtaining the policy; that, to obtain the Nationwide policy, Clay had represented he would cancel the Paul Revere policy, but instead had increased it; that Nationwide had breached no duty of good faith; and that Nationwide had a lawful basis for ceasing to make payments. Clay points out that Nationwide also denied having demanded premium payments and added as a defense that Clay "failed to mitigate his claim by undergoing corrective surgery within a reasonable period of time after becoming disabled." Nationwide withdrew this defense on the morning of trial.
The case went to trial on December 13, 1982, and the trial lasted through December 17. The trial court denied motions by Nationwide for directed verdict at the close of Clay's evidence and at the close of all the evidence. At the close of all the evidence, the trial court granted Clay's motion for directed verdict on the contract count and denied it on the bad faith count. The court granted a directed verdict for Nationwide on the fraud count. On the contract claim, the trial court awarded $46,165.00. The jury returned a verdict of $1,250,000.00 on the bad faith claim. The trial court later denied Nationwide's motion for judgment notwithstanding the verdict, new trial, or remittitur. Nationwide appealed.

Issues
Nationwide states eleven issues, but argues them under the following four headings: 1) The trial court erred in directing a verdict for Clay under the contract claim; 2) The trial court erred in denying Nationwide's motions for directed verdict on the bad faith claim; 3) Various rulings by the trial court improperly and materially prejudiced the defendant; and 4) The trial court erred in refusing to order a remittitur. We shall discuss the issues under corresponding headings.

The Contract Claim
Nationwide argues that the court should not have directed a verdict for Clay because there was evidence in favor of Nationwide's position that it was not liable on the contract claim. Nationwide asserts that there was substantial evidence that Clay misrepresented his income and falsely stated that he would cancel the Paul Revere policy. According to Nationwide, each of these misrepresentations provided a basis upon which to void the policy. Nationwide further argues that the dispute as to the amount due on the policy makes the directed verdict improper.
Regarding Clay's statement on the application that his income was $1800 per month, Nationwide's primary argument is that, although Clay's deposits to his law office account for 1976 totalled $26,714.41, his office overhead averaged $900 to $1000 per month and thus his income was less than $1800 per month. Nationwide argues that it does not have to prove that Clay intentionally misstated his income, because Code 1975, § 27-14-7, provides that
"Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:
(1) Fraudulent;
(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made *542 known to the insurer as required either by the application for the policy or contract or otherwise."
Nationwide argues that it would not have issued as much coverage if it had known the true amount of Clay's income.
This argument depends upon Nationwide's position that "average earned monthly income" on the application means "net income" after deduction of office overhead. Nothing on the application compels such a conclusion, but Nationwide argues that its "Agent's Portfolio," introduced as Plaintiff's Exhibit 13, defines income so as to require deduction of expenses. Under "Monthly Indemnity Benefits," that exhibit defines "earned income" as "1. Income before taxes arising from occupation, or 2. Net income, after expenses, but before taxes, arising from the operation of a business."
The trial court observed that
"there's no definition of income in the policy. The policy is to be construed against the insured [sic]. There is gross income and there's net income. If a person is disabled to work it doesn't presuppose that he's going to go out and fire his secretary and close his office immediately. He may go back to work in six months. And I would think that it means gross income."
Although the record indicates that the trial court stated that the policy is to be construed against the "insured," this is clearly either a typographical error or a slip of the tongue. The trial court correctly applied the rule that ambiguities are to be construed against the insurer. See the many cases cited in 12 Alabama Digest Insurance Key # 146.7(1). See, for example, Employers Ins. Co. of Alabama v. Jeff Gin Co., 378 So.2d 693 (Ala.1979); Alabama Farm Bureau Ins. Co. v. McCurry, 336 So.2d 1109 (Ala.1976); and Mutual Benefit Health & Accident Ass'n of Omaha v. Reid, 279 Ala. 136, 182 So.2d 869 (1966).
Counsel for Clay cited to the court the cases of Rambin v. Continental Casualty Co., 186 So.2d 861 (La.Ct.App.1966), writ refused, 249 La. 578, 187 So.2d 740 (1966); and Allstate Ins. Co. v. Winnemore, 413 F.2d 858 (5th Cir.1969). In the former, the Louisiana court held that "`average monthly earnings' is ambiguous," that "`earnings'... does not necessarily mean `net earnings' unless qualified in some manner," and that the interpretation most favorable to the insured would be adopted. 186 So.2d at 864. In the latter case, the Fifth Circuit Court of Appeals stated that even though an innocent misrepresentation might void the policy, "[W]e think it is possible that if Winnemore did not know or could not be expected to know the meaning of `earnings' on the insurance application, he did not make a misrepresentation." 413 F.2d at 863.
Nationwide cites General Accident, Fire & Life Assurance Corp. v. Jordan, 230 Ala. 407, 411, 161 So. 240, 242 (1935), for the Court's statement, "That [plaintiff] was repaid for his business expenses is not, in our opinion, a part of his earnings." Reimbursement for out-of-pocket expenses, however, is quite different from fees earned by an attorney: in the former case, the individual pays his expenses out of ordinary income, and inclusion of reimbursement as income would cause the sum to be included twice. On the other hand, an attorney would normally consider the entire amount of a fee paid to him as income, and could not be expected to deduct expenses unless specifically instructed to do so.
We agree with the trial court and the cited authorities that Nationwide's failure to tell Clay that "average earned monthly income" means net income prevents it from avoiding coverage on this ground. Furthermore, even within Nationwide's internal rules, there is an ambiguity as to whether Clay's law practice would constitute an occupation or a business, and only in the latter instance would expenses be deducted. Finally, the "Relation of Earnings to Insurance" clause of the policy contemplates the use of a two-year period to determine average monthly earnings. In the two-year period preceding the application, Clay averaged over $2,000 income *543 per month even after the deduction of office expenses. Thus, the trial court's decision to rule for Clay on this issue was eminently proper: not only did Clay have no reason to suspect he should give a "net income" figure, but also Nationwide's own rules, interpreted strictly against the insurer, preclude the use of a one-year net income average for a professional, whose income arises from an occupation, not a business.
Nationwide also argues that the trial court erred in granting a directed verdict on the contract count, because Clay represented that he would cancel the Paul Revere policy, but, instead, increased it. This argument has two branches: one, that Nationwide should not have to pay benefits because of the misrepresentation; and two, that the trial court should not have directed a verdict because the existence of other insurance presented a factual question on the amount of benefits due. Clay's response essentially is that he did cancel the existing policy as he said he would do, and the fact that he took out higher coverage with Paul Revere after he obtained the Nationwide policy does not allow Nationwide to avoid coverage under its policy. He asserts that the calculation of benefits due was a simple matter of arithmetic and Nationwide made no objection before the jury retired to the trial court's performing this calculation.
The trial court made the following remarks during argument about the admissibility of evidence on this issue:
"That's not going to be a defense as far as this Court is concerned.... A man notifies an insurance company that he's going to cancel it and the agent comes back out and talks him out of it; it's absolutely clear to me that it's not a misrepresentation if he did what he said he was gonna do. And, that's undisputed, isn't it?
"[Attorney for Nationwide]: Your Honor, it's not his intentions, it's what he does, his actions.
"The Court: Well, you're asking him to be held responsible for what the insurance company caused.
"...
"You know, to me it is just absolutely irrelevant. I mean, because the representation is that he was going to cancel it. That's what he tried to do. That's undisputed. Then he decides he's going to get another policy. That's undisputed. How the company treated that new policy, he didn't even know about that. What difference ... I can't see what difference it makes.
"...
"I don't know how you can possibly hold an insured to what an insurance company does, how they internally treat something. That's the reason I don't see any relevance."
Paul Revere's agents treated the policy issued to Clay in February 1977 as a "make-over" of the policy he had at the time he applied for the Nationwide policy. Nationwide insists that this indicates Clay did not cancel the existing policy and thus that he made a misrepresentation when he said he would cancel it; and that this misrepresentation gives Nationwide a basis for rescinding its policy.
The difference between increasing the pre-existing policy and taking out a new policy after securing the Nationwide policy comes into play for the following reason: if Nationwide takes an application to supplement an existing policy, it will deduct the existing coverage from the amount of coverage it is otherwise willing to provide. Nationwide will write disability insurance for approximately half of an insured's income, reasoning that more coverage would be "overinsurance," tempting the insured to prolong a disability. Thus, with Clay stating that he made $1800 per month, if he had said he would keep the Paul Revere coverage of $400 per month, Nationwide would have provided only $500 additional coverage.
On the other hand, as a Nationwide underwriter testified, Nationwide cannot control what an insured does after he takes *544 out a policy with Nationwide. Therefore, the policy includes the "Relation of Earnings to Insurance" clause. This clause provides that, if the total "loss of time" coverage exceeds the insured's monthly income "at the time disability commenced or his average monthly earnings for the period of two years immediately preceding a disability..., whichever is greater," Nationwide will pay a prorated amount of benefits and return the excess premiums.
As it turned out, when Clay made his claim Paul Revere reduced its coverage to $1250 per month with an additional one-year benefit of $150 per month. The trial court calculated the benefits due under Clay's Nationwide policy when it directed a verdict on the contract claim. These calculations were not preserved in the record. Clay, in his appellee's brief, provides calculations which would justify the $46,165.00 award made by the trial court. He states, moreover, that these calculations give Nationwide the benefit of the doubt in three respects: they allow proration of his Nationwide policy in spite of Harker's representation that the Paul Revere, not the Nationwide, policy should be prorated; they allow the relation-of-earnings provision to apply to the $1300-per-month rider, which is inconsistent with Nationwide's position that the waiver-of-premium provision in the policy did not apply to the rider; and they do not give Clay any refund of excess premiums for prorated benefits.
Clay further makes the argument that when Harker denied coverage on the basis of a pre-existing condition, he waived the defense of misrepresentation regarding cancellation of the Paul Revere policy, because he already knew of the $2200 Paul Revere policy.
Nationwide argues that the "stacking" of coverage shows an intent to defraud. Clay's attorney responded at trial that Nationwide had not pled a defense raising this issue, and the court agreed: "It doesn't make any difference how many policies he has unless you are relying upon a defense that he knew he was going to be disabled." During this colloquy, which occurred during Clay's testimony on the third day of trial, the court remarked:
"Well I'll just tell you and I'll put it on the record, I'm prepared at this time to direct a verdict for the Plaintiff on the main claim and submit only the issue of bad faith to the jury. I just don't see any, absolutely no defense and I don't understand why this claim was not paid. It's something I must decide. The jury must decide whether or not it was denied based on bad faith. But I don't see any legitimate arguable defense in this case.
"...
"I just don't think at this point, absent some other evidence, that there is any arguable defense based upon the defenses you presented to me...."
Nationwide argues that these remarks were improper because it had not yet begun to put on its case. However, the court did not direct a verdict at this time, but did so only at the close of all the evidence. Moreover, the court stated that its conclusion was tentative, "absent some other evidence."
Nationwide points to the fact that Clay made no answer to the question on the claim form asking whether he had other insurance. The question, however, asked for "any other Companies with whom you may carry Accident & Sickness insurance." Clay testified that he thought of disability coverage as "income insurance" and thought the question meant medical insurance. Indeed, Clay's policy is titled a "Disability Income Policy." See Mutual Benefit Health & Accident Ass'n of Omaha v. Reid, 279 Ala. 136, 182 So.2d 869 (1966), in which the Court held that a clause in a health and accident policy referring to "other insurance" did not include a life insurance policy providing additional benefits for death or disability by accidental means.
At any rate, when he talked to Otey on the telephone, Otey said he was aware of the Paul Revere and National Home policies. Furthermore, the existence of the Paul Revere policy came to Nationwide's attention before Harker denied coverage *545 based on a pre-existing condition, so Clay argues that Nationwide waived any defense on this basis.
We find no error in the trial court's action. Paul Revere issued the $2200 policy after Nationwide issued its policy. Since the higher Paul Revere policy was not in existence at the time Nationwide issued coverage, it could have had no effect on Nationwide's decision to issue its policy. Therefore, while the Paul Revere policy might have an effect on the amount of benefits due under the Nationwide policy, it could not serve to void the Nationwide policy completely.
Neither does Nationwide present any error in the trial court's decision to calculate the amount of benefits due under the contract. The only objections Nationwide made were to the general issue of directing a verdict on the contract count. When the trial court repeatedly stated that it would calculate the benefits, Nationwide made no objection. Neither did it make any effort to preserve a record of the manner in which the trial court made the calculation. Thus the only question presented for our review is the actual decision to direct a verdict on the contract count, and we have resolved that question above.

The Bad Faith Claim
Nationwide argues that the numerous disputes raised questioning Clay's disability, income, and other insurance show that there were arguable reasons for denying the claim and thus it was error for the trial court to deny its motion for directed verdict on the bad faith claim.
The trial court correctly instructed the jury on the elements of an action for bad faith refusal to pay an insurance claim:
"An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact.
"No lawful basis means that the insurer lacks a legitimate or an arguable reason for failing to pay a claim. When a claim is fairly debatable, the insurer is entitled to debate whether the debate concerns a matter of fact or one of law.
"In order for the Plaintiff to recover, he must satisfy you from the evidence as to the following things:
"(One) That there was an insurance contract between the parties and a breach of that contract by the Defendant.
"(Two) An intentional refusal to pay the insurance claim;
"(Thirdly) The absence of any arguable or legitimate reason for that refusal; the absence of a debatable reason to pay the claim [sic];
"And, lastly, the insurer's knowledge or actual knowledge of the absence of any legitimate or arguable reason.
"In short, the Plaintiff must go beyond the mere showing of non-payment and must prove a bad faith non-payment. A non-payment without any reasonable grounds for dispute, or, stated differently, the Plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.
"Whether an insurance company is justified in denying a claim under a policy must be judged by what facts it had before it at the time the decision was made to deny the claim."
We note that these instructions omitted the element of "intentional failure to determine whether or not there was any lawful basis for such refusal." See, e.g., Cincinnati Ins. Co. v. Little, 443 So.2d 891 (Ala.1983); National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357 (Ala.1982); and National Security Fire & Cas. Co. v. Bowen, 417 So.2d 179 (Ala.1982).
Nationwide argues that the element of refusal to pay is lacking because Nationwide made four payments on the claim and ceased only because Clay, instead of providing income information in response to Nationwide's March 28, 1978, letter, filed this lawsuit.
Clay responds that Nationwide's repeated refusals to cooperate justified him in disbelieving the letter's statement that *546 the income information would settle the matter. He states that the course of negotiating the claimthe failure to return his calls, the refusals to locate his file, and the denials of receiving letters and reports (which did in fact turn out to be in his file)show at least a bad faith failure to investigate, if not that Nationwide's periodic refusals to pay were made with actual knowledge of a lack of an arguable reason.
Clay also argues that Harker's decision to deny coverage based on a pre-existing condition waived a defense of misrepresentation that the Nationwide policy would replace the Paul Revere policy. He says this choice of grounds for denying the claim constitutes a waiver because Harker knew at the time he made this denial of coverage that Clay had a Paul Revere policy in effect. We need not reach this claim that such a waiver shows that Nationwide later raised the "other insurance" and "insufficient income" grounds in bad faith. There was sufficient evidence of bad faith assertion of these grounds without a finding that Nationwide had waived them as a matter of law.
Harker stated that he decided that Clay might not have sufficient income on the sole basis that Clay had not filed income tax returns, and he refused to explain to Clay why he wanted the income information. This evidence supports a finding that Harker's attempt to have Clay prove he was entitled to coverage was made in bad faith. When this evidence is considered along with the evidence of Nationwide's seriatim assertions of grounds for denying coverage, which were not supported by the facts and documents before Otey and Harker, but only by their assumptions, it becomes clear that the evidence was sufficient to go to the jury on the bad faith claim. Therefore, the court did not commit error in denying Nationwide's motion for directed verdict on that claim.

Rulings by the Trial Court
This group of arguments presupposes that the trial court was in error on the merits on various aspects of the case. Most of the rulings complained of have been set out or discussed specifically above. We need not address the others explicitly because to do so would only require a reiteration of the holdings already made herein.

Remittitur
Nationwide insists that the verdict on the bad faith claim was excessive under the facts of the case. In light of the punitive nature of the damages, we find nothing in the record to show that the jury exceeded its discretion. There was no evidence before the trial court that paying the verdict would be unduly oppressive to Nationwide. Nationwide's repeated unjustified denials of Clay's valid claim constitute the very type of claims handling which the bad faith action is designed to prevent. The jury fixed the amount and there is no evidence of "bias, prejudice, corruption, or other improper motive," which would require the trial court to set aside the jury's verdict. Shiloh Const. Co. v. Mercury Const. Corp., 392 So.2d 809 (Ala.1980); B & M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala.1979). The trial court denied Nationwide's motion for JNOV, new trial, or remittitur.
The judgment is affirmed.
AFFIRMED.
FAULKNER, JONES, SHORES, EMBRY and ADAMS, JJ., concur.
TORBERT, C.J., dissents in part and concurs in part, with opinion, in which BEATTY, J., concurs.
MADDOX, J., dissents with opinion.

ON APPLICATION FOR REHEARING
ALMON, Justice.
OPINION MODIFIED. APPLICATION OVERRULED.
FAULKNER, JONES, SHORES, EMBRY, and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX, and BEATTY, JJ., dissent.
TORBERT, Chief Justice (dissenting in part and concurring in part).
I dissent from that part of the majority opinion which affirms the bad faith judgment *547 for Clay. Once again we are faced with a bad faith claim where the facts unquestionably show that the insurer's conduct was not an example of how to properly process a claim made by an insured. To the contrary, the claim was badly handled, but this is clearly not the issue here. And as I said in Aetna Life & Casualty Insurance Co. v. Lavoie, 470 So.2d 1060 (Ala. 1984), and Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala.1984), alternatives to the tort of bad faith should be pursued in order to regulate the improper conduct of insurers. However, the question presented here is whether a jury could find that this insurer's conduct rose to the level of "bad faith" as currently defined by this Court.
First, I will address the propriety of the directed verdict on the contract claim. Nationwide contends that Clay's misrepresentation of income on the application entitles Nationwide to void the policy. Obviously, the first inquiry should be whether Clay in fact made a misrepresentation as to his "average earned monthly income." Nationwide maintains that the term "average earned monthly income" means the average of net monthly income, that is, gross income less expenses. However, there is no evidence that Clay knew that Nationwide meant net "average earned monthly income." It is only if neither Clay's net nor his gross "average earned monthly income" was the amount stated that it could be said that Clay misrepresented his income. At trial it became clear that using either a one-year or two-year average of monthly earnings prior to the disability, Clay's gross income was at least the amount stated in the application. Under the two-year average method, his net income also was at least the amount stated in his application. The trial court's finding that there was no evidence to support the misrepresentation claim was correct.
Clay's level of income was important for another reason. The extent of Nationwide's liability under its "relationship of earnings to insurance" clause was a function of two factors, Clay's income and the amount of loss-of-time coverage Clay held with other insurers. I find no error in the trial court's determination of the extent of Nationwide's liability based upon the information produced at trial.
However, while at trial there was sufficient information from which the extent of Nationwide's liability could be determined, that information was not made available to Nationwide until just before trial. Whether Nationwide acted in "bad faith" depends upon whether at the time of denial of benefits, Nationwide had a debatable reason for denying the claim.[1] On the initial claim form submitted by Clay, the questions asking for monthly income and whether the insured had other insurance were not answered. Subsequently, Nationwide learned that Clay had not filed federal income tax returns for the years 1975, 1976, and 1977. The facts that Clay had not disclosed his income on the claim form and that he had not filed tax returns for the three years preceeding his disability were sufficient to create a debatable reason as to whether Clay had sufficient income to entitle him to the full benefits of the policy. Clay's adamant refusal to reveal any financial information, no matter how justified he may have felt in refusing to answer, certainly served to confirm Nationwide's concerns that Clay's income was not what Clay originally represented in his application.
I believe that Nationwide had a debatable reason for questioning the extent of its liability and that the existence of this debatable reason precludes a finding of bad faith.
BEATTY, J., concurs.
MADDOX, Justice (dissenting).
I believe there was at least a "scintilla" of evidence of a factual dispute between the parties over whether the terms "average earned monthly income" in the policy meant "net income" after deduction of office *548 overhead; therefore, a directed verdict on the contract count was error, in my opinion. On the bad faith portion of the claim, I remain convinced that these disputes could best be resolved by the procedure I outlined in my dissent in Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala.1984).

ON MOTION FOR WITHDRAWAL OF OPINION

AND SUGGESTION OF DISQUALIFICATION
PER CURIAM.
Motion denied on the authority of Aetna Life & Casualty Co. v. Lavoie, 470 So.2d 1060 (Ala.1985).
MOTION DENIED.
All the Justices concur.
NOTES
[1] Clay was 38 when his cataracts developed.
[1] This is clearly a "first tier" bad faith case, as the trial court did not even charge the jury as to the "second tier" of bad faith.