525 So.2d 1339 (1987)
NATIONWIDE MUTUAL INSURANCE COMPANY
v.
Henry Garrard CLAY.
NATIONWIDE MUTUAL INSURANCE COMPANY, a corporation
v.
Henry Garrard CLAY.
82-536, 82-917.
Supreme Court of Alabama.
June 26, 1987.
Rehearing Denied April 29, 1988.
*1340 Bert S. Nettles and Forrest S. Latta of Nettles, Barker, Janecky & Copeland, Mobile, and Geoffrey C. Hazard, Jr., New Haven, Conn., for appellant.
Fred W. Killion, Jr. and William W. Watts of Reams, Vollmer, Philips, Killion, Brooks & Schell, Mobile, and Patricia K. Olney, Merritt Island, Fla., for appellee.
Edgar M. Elliott III and Karon O. Bowdre of Rives & Peterson, Birmingham, for amicus curiae State Farm Mut. Auto. Ins. Co.
PER CURIAM.
This case comes to us again on remand from the Supreme Court of the United States. The judgment of this Court was vacated and the case was remanded to us for further consideration in light of Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). In the Lavoie case, the judgment was vacated because one of the Justices of this Court had authored the opinion in a 5-4 decision involving the tort of bad faith when he contemporaneously was litigating a tort of bad faith claim against another insurance company. The Supreme Court of the United States concluded that as a participating judge in the Lavoie case, he was "a judge in his own case." As a result, his interest in the Lavoie case was "direct, personal, substantial, [and] pecuniary." Because of "due process" concerns, the Supreme Court opined that "the appearance of justice" would be best served if this Court proceeded to review the Lavoie case without participation by the offending Justice. By a *1341 subsequent mandate, we are now required to review the issues in the instant litigation in light of the principles enunciated in Lavoie.
No perimeters were set forth in the Supreme Court's vacation of our judgment in this case. As a result, plaintiff Clay suggested that the non-disqualified members of the Court merely affirm the decision and allow the former judgment to stand. This is because the decision in this case, as contrasted with that in Lavoie, was a 6-3 decision. The elimination of the offending Justice's vote would allow the judgment to stand because it would still have the sufficient five votes to constitute a majority. However, we concluded that a true "appearance of justice" mandated that we require a complete rebriefing, reargument, and redeliberation of this case with the participation of all nine Justices presently on this Court. The result of our deliberations is that the judgment of the trial court is affirmed.
Although our prior opinion in this case, 469 So.2d 533, contained an extensive statement of facts, we will, for purposes of this opinion, state again briefly the events leading up to the filing of this suit.
On June 14, 1966, Henry Garrard Clay, a practicing attorney, took out a disability income insurance policy with Paul Revere Insurance Company. Over ten years later, on December 8, 1976, Clay was contacted by a friend of his, Bill McDowell, an agent for Nationwide Mutual Insurance Company, about applying for a disability policy with Nationwide. In the application for insurance, Clay stated that his monthly income was $1,800.00. After Nationwide's doctor gave Clay a "clean bill of health," Nationwide issued Clay a disability income policy, effective January 19, 1977. Clay also promised to cancel a disability policy he had with Paul Revere Insurance Co.
Clay then contacted Paul Revere Insurance Company to cancel his policy of insurance with it. Upon receipt of Clay's notice of intent to cancel his disability policy, an agent of Paul Revere contacted Clay in an attempt to change his mind. After much discussion, Clay agreed to a new disability income policy with Paul Revere. According to the agent who sold Clay the policy, he told Clay that Paul Revere would cancel his old policy and take the same amount and incorporate it into a new policy. Clay then attempted to cancel his Nationwide policy, but could not get in touch with his agent, McDowell, because McDowell had been promoted and transferred to another town. A few weeks later, when Clay received a policy from Nationwide in the mail, he again attempted to contact McDowell to have this policy cancelled. It was at this time that Clay was first informed that McDowell had been promoted and that this was why he was having trouble contacting him.
On August 29, 1977, Clay first realized that he was having difficulty reading. On that day, he went to see Dr. Ross, an optometrist. Ross examined Clay and diagnosed cataracts. This was the first time anyone had diagnosed Clay as having cataracts. On September 7, Clay saw Dr. Harrison, who confirmed that he had cataracts. Dr. Harrison told him that the cataracts would get worse, and that eventually he would go blind. On this day, Clay closed his law office. Approximately three weeks later, Clay filed a disability claim with Nationwide. Clay's claim was assigned to Jim Otey, a Nationwide medical claims examiner. Clay first had communication with Otey in October of 1977. For a period of almost a year, Clay had extensive communications with Otey and with John Harker, a claims attorney for Nationwide. Several of Clay's phone calls to Otey and Harker were never returned, and when Clay was able to contact either person, he was often given what he called a "run around." Specifically, Clay was told that certain documents were not in his file when the person knew these documents were in his file. Also, certain letters and other papers necessary for the processing of his claim were stamped "filed" by Nationwide, but persons investigating the claim either did not find them or did not bother to take the time to check to see if indeed these papers were in the possession of Nationwide.
*1342 After several doctors had examined Clay and confirmed that he had cataracts, Harker agreed that Clay was disabled; however, Harker claimed that this was a pre-existing condition, and, therefore, said that Nationwide was not going to pay on the claim. Clay even corresponded with O.B. Carr of the Alabama Insurance Commission and complained about the treatment he was receiving from Nationwide. After two or three calls and letters from Carr, as well as numerous unanswered phone calls and letters from Clay, Harker finally authorized a payment of $1,300.00 to Clay on January 19, 1978. The check was not received by Clay until almost a month later. Even after payment of this $1,300.00, Nationwide was still three months in arrears. Furthermore, Nationwide was regularly withdrawing a monthly premium from Clay's checking account, even though Clay's policy had a waiver of premium provision that should have taken effect. Over the next four months, Clay had several more communications with Nationwide. At one point, Clay told Harker that he was contemplating filing suit, to which Harker replied, "go ahead, but you won't receive one nickel for ten years." Finally, after numerous attempts by Clay to have the matter resolved, he filed suit against Nationwide on July 14, 1978.
Even as late as October 1978, Clay was trying to have the automatic payment of his premium stopped. Nationwide's only response was that if he ceased making premium payments, he would not be entitled to further payments on his claim. In an interrogatory addressed to Nationwide as to why it was continuing to require Mr. Clay to pay the premiums on the disability insurance policy, Nationwide answered that "presumably any payments made by Mr. Clay were made voluntarily by him."
Although Nationwide makes numerous arguments as to why the judgment in this case should be set aside, the arguments are directed to two main issues. Issue one is whether the trial court properly submitted the issue of bad faith to the jury. Issue two is whether the award of $1.25 million in punitive damages for bad faith failure to pay $46,000.00 in disability benefits was excessive. We are of the opinion that the trial court's resolution of both issues was proper. Before addressing Nationwide's arguments individually, we note that "whether an insurance company is justified in denying the claim on the policy must be judged by what was before it at the time the decision was made." National Security Fire & Casualty Insurance Co. v. Vintson, 454 So.2d 942 (Ala. 1984). Thus, evidence favorable to an insurer that arises after a bad faith denial should not be relevant to the propriety of the conduct of the insurer at the time of its refusal.
Nationwide first asserts that there was a genuine dispute over the amount of the benefits owed, and that this justified its denial of the claim. However, the calculation of benefits was not an issue at the time Nationwide denied the claim. Rather, Nationwide, at that time, took the position that Clay was not disabled or, alternatively, that his disability pre-existed the issuance of the insurance policy. Nationwide asserts in its brief that it is undisputed that Clay demanded full contract benefits under the policy, but the record indicates that Clay never demanded any specific amount, but only whatever was due him. Clay was never informed by Nationwide that it was unable to calculate the amount of the claim, or that the claim was subject to proration.
Nationwide's next argument is that it had a debatable reason to refuse to pay Clay because he made various misrepresentations in his application for insurance. Nationwide states that Clay represented that he was going to cancel the Paul Revere policy, but did not cancel it, and, instead, increased the amount of his coverage. There is no proof, however, that Clay did not intend to cancel the Paul Revere policy at the time he filled out the Nationwide application. The facts indicate that Clay called Paul Revere in order to to cancel the policy and was later convinced by Paul Revere that he should not cancel. This was the testimony of Clay, and there is no evidence from Nationwide to the contrary. *1343 Thus, the evidence on record indicates that it was Clay's intent to cancel the policy when he filled out the application for insurance with Nationwide. There is further evidence that he thought he did cancel the policy and that a new policy was issued for a higher coverage. The fact that the new policy was simply a "makeover policy" is not relevant to the issue of Clay's intent to cancel at the time he filled out the application with Nationwide. Lawson v. Cagle, 504 So.2d 226 (Ala.1987).
Nationwide argues that Clay also misrepresented his average monthly earnings. However, it is undisputed that Nationwide never informed Clay that "average monthly income" meant "net income." Even so, Nationwide's choice of a single 12-month period in estimating average monthly income has no rational basis. Any other time period chosen would reveal that Clay's average monthly income was well in excess of $1,800.00 a month, even subtracting operating expenses. Since there was no evidence that Clay knew that the figure he was to put down concerning his average monthly income was supposed to be a "net income" per month, this ambiguity in the question on the application was correctly construed against the insurer by the trial court.
Finally, Nationwide had no lawful basis to deny the payment based on misrepresentation in the application, because, as a matter of law, it waived such a defense by continuing to demand and collect premiums. By collecting premiums, Nationwide was ratifying the existence of a contract, which is inconsistent with its position on appeal that misrepresentations on the part of Clay voided any contract.
On appeal, for the first time, Nationwide raises a claimed lack of cooperation on the part of Clay as a defense to the claim. This issue is meritless, because there is no evidence in the record whatsoever that Clay's alleged refusal to cooperate was the reason the company failed to pay the claim. To the contrary, all the evidence produced at trial showed that Nationwide was the one that failed to cooperate. Since this was not raised as an affirmative defense at the trial, this Court will not consider it on appeal. Green v. Taylor, 437 So.2d 1259 (Ala.1983); Simmons Machinery Co. v. M & M Brokerage, Inc., 409 So.2d 743 (Ala.1981). Even if we were to consider Nationwide's claim of lack of cooperation on Clay's part, inasmuch as Nationwide breached its own duty of good faith and fair dealing in handling the claim, Clay was excused from further obligation on his part under the policy. Under general principles of contract law, a substantial breach by one party excuses further performance by the other. See Smith v. Clark, 341 So.2d 720 (Ala.1977).
Finally, Nationwide argues that its four payments of $1,300.00 each during the pendency of its investigation satisfied the requirements of good faith in dealing with Clay and that this was sufficient to keep the issue of bad faith from going to the jury. As with the lack-of-cooperation issue, partial payment was never raised as a defense to the claim, as required by Rule 8(c), Alabama Rules of Civil Procedure. It cannot, therefore, be raised on appeal. Green, supra, and Simmons, supra.
The cases cited by Nationwide in support of its argument that partial payment exempted it from liability for bad faith are all distinguishable from the present case in one respect: in each of those decisions, the Court found no evidence of bad faith in the refusal to pay a claim. It is ludicrous to suggest that partial payment could avert liability altogether. If this were the case, then partial payment could be used simply as a guise to conceal an otherwise intentional denial of the claim. Rather, partial payments in this case are evidence of the fact that Nationwide tried to delay full recognition of Clay's claim for an extended period of time. Sexton v. Liberty National Insurance Co., 405 So.2d 18 (Ala.1981); Cincinnati Ins. Co. v. Little, 443 So.2d 891 (Ala.1983); Bowers v. State Farm Mut. Auto. Ins. Co., 460 So.2d 1288 (Ala.1984); National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179 (Ala.1982).
Other than the five reasons discussed above, there are several other instances *1344 during the almost ten-month period in which bad faith refusal to pay was demonstrated on the part of Nationwide. Nationwide first took the position that Clay was not disabled, which was directly contradicted by several doctors' reports (which were shown to be in the hands of Nationwide when it denied the claim), showing that Clay was, indeed, disabled. When this position seemed to no longer be maintainable, Nationwide argued that the condition pre-existed the policy. Again, Nationwide had in its possession a report showing that this was not the case. Nationwide then took a frivolous position when it asserted that Clay failed to undergo surgery and, therefore, did not mitigate his claim. This assertion hardly needs to be discussed, as there is no duty or requirement on the part of a disabled person to have surgery.
The record is replete with examples of Nationwide's intentional failure to investigate Clay's claim. The tort of bad faith was recognized to deal with just this type of situation. Therefore, the trial court was correct in allowing the issue of bad faith to go to the jury. Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981); National Sec. Fire & Cas. Co. v. Vintson, 454 So.2d 942 (Ala.1984); Federated Guaranty Life Ins. Co. v. Wilkins, 435 So.2d 10 (Ala. 1983); National Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357 (Ala.1982); National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179 (Ala.1982); Chavers v. National Sec. Fire & Cas. Co., 405 So.2d 1 (Ala.1981); Continental Ins. Co. v. Kountz, 461 So.2d 802 (Ala.1984).
Nationwide argues that, assuming without admitting, there was a bad faith claim sufficient to go to a jury, the jury award of $1.25 million in punitive damages for bad faith failure to pay $46,000.00 in disability benefits was excessive. Nationwide makes this challenge to the jury verdict on federal and state constitutional grounds, as well as on the basis of our case law. It claims that the verdict and the judgment entered on that verdict violate the 14th Amendment, the excessive fines clause, and the ex post facto clause of the United States Constitution. However, we note that these challenges were not presented for resolution before the trial court and have been presented for the first time on appeal. Resolution of these issues would violate a fundamental principle of appellate jurisdiction: that issues not raised before the trial court may not be raised on appeal. Green, supra.
On state law grounds, Nationwide argues that punitive damages should bear some particular mathematical relationship to compensatory damages. However, we have repeatedly held that punitive damages need not necessarily bear any particular relationship to compensatory damages. U-Haul Company of Alabama v. Long, 382 So.2d 545 (Ala.1980). We have said that decisions on punitive damages must be made on a case-by-case basis, and it is clear from our cases that this Court is willing to uphold substantial jury awards for damages, even in excess of $1,000,000, when the facts warrant such an award.
The facts, as stated in this opinion, clearly show that the jury's award was warranted. Furthermore, there is no evidence that the jury's verdict was based on bias, prejudice, corruption, or other improper motive. The trial court, properly denied Nationwide's motion for JNOV, new trial, or remittitur. The judgment is, therefore, affirmed.
AFFIRMED.
JONES, ALMON, SHORES and ADAMS, JJ., concur.
BEATTY, J., concurs specially.
MADDOX, J., dissents.
BEATTY, Justice (concurring specially).
Upon a full review of the record in this case, I find that it appears conclusively that there was evidence from which a jury could have found that Nationwide acted in bad faith when it first denied Clay's claim. At the time of this first denial, Nationwide had in its possession reports from several physicians, none of which supported the basis for Nationwide's denial of the claim, viz., that Clay's cataracts were a pre-existing *1345 condition. While the various physicians' reports indicated that Clay's cataracts had begun to develop prior to the date they were diagnosed, August 29, 1977, none of the reports indicated that Clay's cataracts existed or had begun to develop prior to the effective date of his policy with Nationwide, January 19, 1977. Indeed, Dr. Allen's December 14, 1976, report indicated that Clay was having no problems with his eyes at that time. Clearly, these facts made the issue of bad faith a question for the jury.
MADDOX, Justice (dissenting).
If the Court would reduce the amount of the judgment in this case to the sum of $100,000, the amount Clay sought on his contract claim, I would concur in the opinion.
Because I am of the opinion that there was a debatable reason for Nationwide's refusal to pay this claim, I believe that Nationwide was entitled to a directed verdict on the bad faith claim. While I believe that the trial court erred in directing a verdict for Clay on his contract claim, I would not reverse the judgment and order a new trial, because of the particular circumstances of this case, but I would require an additur of that judgment to allow Clay to recover the full amount he sought on the contract claim, $100,000. In my special concurrence in Aetna Life Insurance Co. v. Lavoie, 505 So.2d 1050 (Ala. 1987), I set out my views on the development of the law of bad faith failure to pay an insurance claim, and I concurred in the conditional affirmance of the judgment in that case, because I was of the opinion that certain consequential damages should be permitted in a bad faith claim case involving an alleged breach of a non-commercial insurance contract, and I called upon the legislature to address the problem that is presented in cases such as the one here.
In this case, Clay, in addition to his claim for damages for breach of the contract, also asked for damages for "mental anguish." As I pointed out in my special concurrence in Aetna Life Insurance Co. v. Lavoie, I am of the opinion that this alternative to the bad faith theory of recovery should be adopted by this Court. Because I am of the opinion that the evidence would support a jury verdict on the contract claim for the specific damages Clay claimed in his complaint, I would concur in the result to affirm conditionally upon Clay's filing a remittitur of all but $100,000.00 of the damages awarded. Because the Court affirms the judgment on the bad faith claim without requiring a remittitur, as was done in Aetna Life Insurance Co. v. Lavoie, I must respectfully dissent.

ON APPLICATION FOR REHEARING
PER CURIAM.
APPLICATION OVERRULED.
JONES, ALMON, SHORES and ADAMS, JJ., concur.
MADDOX and BEATTY, JJ., concur specially.
TORBERT, C.J., and HOUSTON and STEAGALL, JJ., not sitting.
MADDOX, Justice (concurring specially).
I agree that the application for rehearing should be overruled, but I point out that on original deliverance I dissented and stated that "I would concur in the result to affirm conditionally upon Clay's filing a remittitur of all but $100,000 of the damages awarded."
I am still of the opinion that the judgment should be affirmed conditionally, but I concur with the holding of the majority that Act No. 188, Ala.Acts 1987, which amended Ala.Code 1975, § 12-22-72 and § 12-22-73, which provided for a statutory affirmance penalty of 10%, has no application in this case.