551 So.2d 235 (1989)
HEALTHAMERICA and Pamela Merle
v.
Edward MENTON.
87-1100.
Supreme Court of Alabama.
July 21, 1989.
Rehearing Denied September 15, 1989.
*236 Michael S. McGlothren, Vincent A. Noletto, Jr., and Thomas H. Nolan, Jr., of Brown, Hudgens, Richardson, Mobile, and Steven A. Brower of Wood, Lucksinger & Epstein, Los Angeles, Cal., for appellants.
Robert T. Cunningham, Jr., G. Johnson Rice, Jr., and Andrew T. Citrin of Cunningham, Bounds, Yance, Crowder, and Brown, Mobile, for appellee.
Theresa L. Sorota, Counsel of Record, and Joe W. Peel, Vice President and Gen. Counsel, Health Ins. Ass'n. of America, Phillip E. Stano, Counsel of Record, and Jack H. Blaine, Vice President, State Relations, and Gen. Counsel, American Council of Life Ins., Washington, D.C., for amici curiae.
SHORES, Justice.
The plaintiff/appellee, Edward Menton, was employed as city editor for the Mobile Press Register newspaper ("Press Register"). As part of his employment, Menton was provided with medical insurance coverage, for which the Press Register paid 50 to 60 percent of the premiums and the balance was deducted from Menton's salary. In June 1985, the Press Register offered an alternative medical benefit selection, which allowed qualified Press Register employees either to keep the medical insurance that they had, or to cancel it and enroll in one of the two health maintenance organizations then in the Mobile area, Prime Health and defendant/appellant, HealthAmerica, without suffering an interruption of benefits.
Menton had a son, Jacob, whose premature birth necessitated a series of surgical operations to lengthen and straighten the tendons in his legs and feet. After each such operation, and after his casts were removed, Jacob would undergo physical therapy treatments three times a week until he was ready for his next surgical operation.
*237 Menton's health insurance under the Press Register's employment benefit plan paid 80% of the cost of Jacob's physical therapy treatments and orthopedic appliances. Jacob's second operation was imminent when the Press Register employees were offered alternative coverage by either of the health maintenance organizations. HealthAmerica's list of physicians included both of the physicians who had been treating Jacob's legs; Prime Health's did not. Menton read the promotional literature regarding HealthAmerica's coverage but could not determine from that whether HealthAmerica would provide coverage for Jacob's physical therapy and orthopedic appliances.
At the suggestion of the assistant general manager of the Press Register, who had initially reviewed the coverage provided by HealthAmerica and had helped HealthAmerica distribute information about its plan to the Press Register employees, Menton attended an informational meeting of Press Register employees three days before Jacob's second surgery. This meeting was presided over by defendant/appellant Pamela Merle, who had worked for HealthAmerica for approximately one and one-half months prior to this meeting. During the meeting, the Press Register employees were repeatedly told that the coverage provided by the health maintenance organizations such as HealthAmerica and Prime Health was generally the same as, or was better than, the medical coverage that Menton and other employees had. After the meeting, Menton asked Merle specific questions about HealthAmerica's coverage of Jacob's medical expenses. He explained Jacob's medical history, his impending operation, and his need for extensive physical therapy and orthopedic appliances after his second surgery. In response to a direct question from Menton, Merle informed Menton that Jacob's medical expenses would be "covered one hundred percent by HealthAmerica."
In reliance upon Merle's representations, Menton dropped his health insurance and enrolled in the HealthAmerica plan. After Menton enrolled in the HealthAmerica plan, he received a schedule of benefits in the mail. On reviewing the schedule, Menton noticed that outpatient services for physical therapy were apparently covered for only 60 days. Menton attempted to get HealthAmerica to provide the coverage that he had been promised when he dropped his previous insurance, which provided coverage for 80% of Jacob's physical therapy expenses for an unlimited period of time. HealthAmerica extended coverage for 60 additional days after the initial 60-day period, but would not provide coverage beyond that. Jacob's physical therapy expenses amounted to approximately $150 a week.
Menton filed this suit against HealthAmerica and its agent, Merle, in which he alleged a state common law action for fraud, asserting misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, that caused him to drop the hospital coverage he had under an insured employment benefit plan and to elect the HealthAmerica coverage also provided under the plan. The defendants pleaded the general issue and preemption by the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829 as amended, 29 U.S.C. § 1001 et seq. Menton did not file a claim under ERISA. Predicated on the ERISA preemption, the defendants moved for a directed verdict at the close of Menton's case and at the close of all the evidence. The trial court observed that the Alabama Health Maintenance Organizations Statutes ("HMO Statutes"), Code 1975, §§ 27-21A-1 to 27-21A-32, and the Alabama "twisting" statute, Code 1975, § 27-12-6, might be saved by § 514(b) of ERISA if Menton's claim were subject to ERISA preemption; overruled the defendants' motions for a directed verdict; and submitted the case to the jury with instructions on Alabama civil actions for misrepresentation, without reference to the HMO statutes or the twisting statute. The jury returned a verdict in favor of Menton. After final judgment was entered, Menton filed a motion to amend his complaint to conform to the evidence, alleging a violation of § 27-12-6, the "twisting" statute. The defendants' objection *238 to this was overruled, as was their motion for a judgment notwithstanding the verdict or in the alternative for a new trial.
The first issue presented by this case is whether ERISA preempts a state common law action for fraud where the plaintiff alleges that he relied on misrepresentations made by the defendants in dropping his old hospital insurance and electing coverage under the defendants' plan. We hold that a claim for fraud in the inducement does not "relate to" an employee benefit plan and is therefore not preempted by ERISA.
The courts in Alabama have recognized a common law right of action for fraud, at least since the case of Einstein, Hirsch & Co. v. Marshall & Conley, 58 Ala. 153 (1877), when Justice Stone criticized the old case of Chandelor v. Lopus, 1 Smith Lead. Cas. 319 (9th ed. 1889) (adjudged in the Court during the Reign of James the First), which involved alleged fraud in the sale of a stone, which the seller represented as a bezoar stone and sold as such. All the Barons, except Anderson, in the Court of Exchequer held that "`the bare affirmation that it was a Bezoar stone, without warranting it to be so, is no cause of action; and although he knew it to be no Bezoar stone, it is not material.'" 58 Ala. at 160 (quoting Chandelor v. Lopus). To this Justice Stone wrote, "We submit, if this language does not sanction looser morals than the present state of the law will justify." 58 Ala. at 160. To make certain that it did not sanction those looser morals of Chandelor v. Lopus, the legislature of Alabama in 1907 codified laws that it had enacted that provided civil actions for fraud (now Code 1975, § 6-5-100), for misrepresentations of material fact (now § 6-5-101), for suppression of material facts (now § 6-5-102), and for deceit (now § 6-5-103).
With ERISA, Congress imposed comprehensive federal oversight of employee benefit plans of employers engaged in interstate commerce. Under ERISA Section 502(a), as set forth in 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." This limits the options of the employee, who is preempted from bringing actions under state laws when they "relate to" any employee benefit plan.
ERISA's preemption provision states:
"Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and subchapter III of this chapter supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...."
29 U.S.C.A. § 1144(a).
The defendants argue that Menton is preempted under this ERISA preemption provision from filing a state common law action for fraud. Under the facts of this case, the Press Register is engaged in interstate commerce; the undisputed evidence shows that the Press Register solicits advertisements from outside Alabama, advertises for businesses located outside Alabama, and sells its papers outside Alabama. Menton was a full-time employee of the Press Register, and the Press Register had an employee benefit plan prior to and after Menton enrolled in the HealthAmerica plan.
Therefore, we must determine whether his claim is preempted by ERISA. The defendants rely upon Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), wherein the Supreme Court ruled that a state lawsuit asserting improper processing of a claim for benefits under an ERISA-regulated plan was preempted by federal law. In Pilot Life the Supreme Court held that the phrase "relate to" is to be given its "`broad common-sense meaning, such that a state law "relate[s] to" a benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan."'" 481 U.S. at 47, 107 S.Ct. at 1553, citing Metropolitan Life Insurance Co. v. Massachusetts, infra, and Shaw v. Delta Air Lines, Inc., infra.
*239 The United States Supreme Court had considered ERISA's preemption provision three times prior to Pilot Life: Alessi v. Raybestos Manhattan, Inc., 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); and Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).
In Shaw v. Delta Air Lines, Inc., the Court noted that "[s]ome state actions may affect employee benefits in too tenuous, remote, or peripheral a manner to warrant a finding that the law `relates to' the plan." 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. In Shaw, the Court cited with approval American Telephone & Telegraph Co. v. Merry, 592 F.2d 118 (2d Cir.1979), in which the Second Circuit Court of Appeals held that ERISA did not preempt a state's garnishment of a spouse's benefit plan income to enforce alimony and support orders. In accord, see, Savings & Profit Sharing Fund of Sears Employees v. Gago, 717 F.2d 1038 (7th Cir.1983); Howard v. Parisian, Inc. 807 F.2d 1560 (11th Cir.1987); Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc., 793 F.2d 1456 (5th Cir.1986), cert. denied, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987).
HealthAmerica argues that Pilot Life forecloses debate and that Menton's claim is preempted by ERISA as one "relating to" an employee benefit plan. We disagree. Pilot Life involved an individual who was receiving benefits under a plan insured by the Pilot Life Insurance Company. In 1975, Everate W. Dedeaux injured his back in an accident related to his employment with Entex, Inc. Entex sponsored a long-term disability plan that qualified as an employee benefit plan under ERISA, for employees who became permanently disabled. While Entex assumed responsibility for the disability plan's day-to-day operation and administration, benefits under the plan were provided by a group insurance policy issued by Pilot Life Insurance Company.
Following Dedeaux's accident, Pilot Life provided benefits to him for two years. His benefits under the plan were first interrupted, then terminated altogether. When they were discontinued, Dedeaux sued Pilot Life. Although the complaint in Pilot Life contained a count for "fraud in the inducement," the opinion makes it unmistakably clear that the only claims he pursued were claims seeking damages for improperly processing his claims for benefits under an ERISA-regulated plan. Justice O'Connor, writing for the Supreme Court, stated as follows:
"Although Dedeaux's complaint pled several state common law causes of action, before this Court Dedeaux has described only one of the three countscalled `tortious breach of contract' in the complaint, and `the Mississippi law of bad faith' in respondent's briefas protected from the pre-emptive effect of § 514(a). The Mississippi law of bad faith, Dedeaux argues, is a law `which regulates insurance,' and thus is saved from pre-emption by § 514(b)(2)(A)."
Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, at 48, 107 S.Ct. 1549, at 1553, 95 L.Ed.2d 39, at 48 (footnote omitted). Having considered this single count, the Court held:
"[W]e conclude that Dedeaux's state law suit asserting improper processing of a claim for benefits under an ERISA-regulated plan is not saved by § 514(b)(2)(A), and therefore is pre-empted by § 514(a)."
Id. 481 U.S. 41, at 57, 107 S.Ct. 1549 at 1558, 95 L.Ed.2d 39, at 54 (footnote omitted).
Pilot Life merely cleared the confusion that Metropolitan Life had created in the lower federal courts. Following Metropolitan Life, several lower courts held that insurance companies serving as claims review fiduciaries to fully insured employee benefit plans were subject to the full measure of state remedies, while fiduciaries of self-insured plans were not. Pilot Life rejected the artificial distinction between fully-insured and self-insured plans created by Metropolitan Life.
In this case, Menton does not claim improper processing of a claim, nor any benefits *240 under the terms of the plan. To the contrary, he claims he was fraudulently induced to drop his existing coverage by misrepresentations made by the defendants to him prior to his becoming a member of the HealthAmerica plan. This is the clear distinction between this case and Pilot Life.
The Supreme Court has not drawn a hard, clear line as to which state law is preempted by § 514(a). This is demonstrated by the case of Ft. Halifax Packing Co. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), which was decided two months after Pilot Life. In Ft. Halifax, the Court held that a Maine statute requiring employers to make a one-time severance payment to employees when a plant closed was not preempted by ERISA. The Court noted that the preemption clause expressly states that state laws are superseded to the extent that they "relate to any employee benefit plan." The Court stated that the preemption provision "does not refer to state laws relating to `employee benefits,' but to state laws relating to `employee benefits plans.'" Id., 482 U.S. at 7, 107 S.Ct. at 2215. (Emphasis in original.) The Court observed that ERISA uses the words "benefit" and "plan" separately throughout and nowhere treats the two as synonymous. "Given the basic difference between a `benefit' and a `plan,' Congress' choice of language is significant in its pre-emption of only the latter." Id. at 8, 107 S.Ct. at 2216, 96 L.Ed.2d at 9 (1987).
The distinction made by the Court in Ft. Halifax, between laws that relate to employee benefits plans and laws that relate simply to employee benefits, is analogous to the instant case and demonstrates why Menton's claim for fraudulent inducement does not "relate to" HealthAmerica's plan. Teper v. Park West Galleries, Inc., 431 Mich. 202, 427 N.W.2d 535 (1988), presented a much closer question on preemption than exists here. In that case the Michigan Supreme Court held that a plaintiff's claim against her employer for breach of an employment contract, which claimed, in part, compensation for future pension benefits, was not preempted by ERISA. The court held that "the simple fact that the damage award was based in part upon the terms of the plan does not place any fiscal or administrative burden upon the plan itself. This relationship to the plan is, in the words of the Shaw Court, too `peripheral' to trigger ERISA preemption." 431 Mich. at 208, 427 N.W.2d at 541. Chief Justice Riley, concurring with the majority in Teper, found ERISA's definition of a "state" important for the purposes of the ERISA preemption clause:
"Congress has further explained the scope of ERISA preemption in the definitional section, 29 U.S.C. § 1144(c)(2), wherein the term `state' for preemption purposes is characterized as `a State, any political subdivision thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.'"

431 Mich. at 212, 427 N.W.2d at 545 (emphasis in original).
In Quigley v. UNUM Life Ins. Co., 688 F.Supp. 80 (D.Mass.1988), the plaintiff's decedent was a participant in a retirement pension plan. Plaintiff's decedent received eight years' of monthly annuity payments following his retirement. Following his death, his estate brought an action against UNUM for breach of contract and misrepresentation. UNUM contended that the claims were preempted by ERISA. The federal district court rejected UNUM's preemption argument, finding that the plaintiff's causes of action were "so tenuously related to an ERISA plan that the claims are not preempted." Id., at 82. In so holding the court found:
"The dispute in this case does not involve the plan and the plaintiffs do not claim that any term of the pension plan was violated.... Litigation of these issues will not, in effect, result in state regulation of the pension plans contrary to the purposes of ERISA. The concern which motivated the enactment of the ERISA preemption provisions, the threat of inconsistent and conflicting state regulations of ERISA plans, is not implicated if this action is allowed to go forward. See *241 Ft. Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987)."
Id., at 82-83.
In Greenblatt v. Budd Co., 666 F.Supp. 735 (E.D.Pa.1987), the plaintiff sued his employer for misrepresenting to him that the benefits he was receiving under one of two pension plans would be made equal to those available under the other plan. The Court, after first acknowledging that the Supreme Court has determined that "Congress made the preemption provision `deliberately expansive' and `designed to "establish pension plan regulation exclusively as a federal concern,"'" id., at 741, quoting Pilot Life, rejected the employer's argument that ERISA preempted the plaintiff's claim:
"The cause of action for misrepresentation alleged by the plaintiff at Count II of his complaint should not be preempted because, simply put, the premise underlying this action was that plaintiff was deceived by the verbal statements made and the actions taken by his employer. That the subject of the deception concerned pension benefits is only incidental and not essential to the plaintiff's cause of action. Like promises for a raise in salary, a promotion, or the use of tickets to a baseball game, plaintiff's employer's promise to provide the plaintiff with certain benefits at some unknown time in the future, upon which the plaintiff could reasonably rely, is the essence of the fraud alleged."
Id., at 742. In accord: Morningstar v. Meijer, Inc., 662 F.Supp. 555 (E.D.Mich. 1987) (plaintiff's claim for breach of employment contract against former employer did not "relate to" ERISA plan, despite the fact that plaintiff claimed as part of her damages the value of certain future fringe benefits under an ERISA plan); McNamee v. Bethlehem Steel Corp., 692 F.Supp. 1477 (E.D.N.Y.1988) (plaintiff claimed fraudulent misrepresentation by employer that upon rehiring he would suffer no break in pension coverage, and court found that because plaintiff's claims did not "seek benefits under the plan" his claim was not preempted).
Courts nationwide continue to struggle with ERISA preemption issues occasioned by the "relate to" language in Section 514(a). See: Springer v. Wal-Mart Assoc. Group Health Plan, 714 F.Supp. 1168 (N.D.Ala.1989); Amos v. Blue Cross-Blue Shield of Alabama, 681 F.Supp. 1515 (N.D. Ala.1988), rev'd, 868 F.2d 430 (11th Cir. 1989); Farlow v. Union Central Life Ins. Co., 874 F.2d 791 (11th Cir.1989); Anschultz v. Connecticut General Life Ins. Co., 850 F.2d 1467 (11th Cir.1988); Belasco v. W.K.P. Wilson & Sons, Inc., 833 F.2d 277 (11th Cir.1987); Jordan v. Reliable Life Ins. Co., 694 F.Supp. 822 (N.D.Ala. 1988); Graves v. Blue Cross of California, 688 F.Supp. 1405 (N.D.Cal.1988); Mackey v. Lanier Collections Agency & Service, Inc., 486 U.S. ___, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); Board of Trustees of Cedar Rapids Pediatric Clinic, P.A., Pension Plan v. Continental Assurance Co., 690 F.Supp. 792 (W.D.Ark.1988); Perry v. P*I*E Nationwide, Inc., 872 F.2d 157 (6th Cir.1989); Idaho Plumbers and Pipefitters Health and Welfare Fund v. United Mechanical Contractors, Inc., 875 F.2d 212 (9th Cir.1989); Totton v. New York Life Ins. Co., 685 F.Supp. 27 (D.Conn.1987); Tesch v. General Motors Corp., 685 F.Supp. 1084 (E.D.Wis.1988); Southern California Meat Cutters Unions & Food Employers Pension Trust Fund v. Investors Research Co., 687 F.Supp. 506 (C.D. Cal.1988); Hall v. Pennwalt Group Comprehensive Medical Expense Benefits Plan, (E.D.Pa.1989); Schultz v. Boesken Elec. Co., 703 F.Supp. 656 (S.D.Ohio 1988); Urban Health Services, Ltd. v. Travelers Ins. Co., 703 F.Supp. 53 (N.D.Ill.1989); Holmes v. Pacific Mut. Life Ins. Co., 706 F.Supp. 733 (C.D.Cal.1989); Seafarers' Welfare Plan v. Dixon, 512 So.2d 53 (Ala. 1987); Davidian v. Southern California Meat Cutters Union & Food Employees Benefit Fund, 859 F.2d 134 (9th Cir.1988); Hood v. Prudential Ins. Co. of America, 522 So.2d 265 (Ala.1988); Landy v. Travelers Ins. Co., 530 So.2d 214 (Ala.1988); Massachusetts v. Morash, 490 U.S. ___, 109 S.Ct. 1668, 104 L.Ed.2d 98, (Mass.1989). Although there is authority on both sides, *242 the better reasoned cases, and those which recognize the dual role of state and federal law after ERISA, have reached the conclusion that we have reached today.
Authors Kilberg and Inman in their Observation, Preemption of State Laws Relating to Employee Benefit Plans: An Analysis of ERISA Section 514, 62 Tex.L.Rev. at 1328-30 (1984), suggest that the Act contemplates a different approach to these cases. They argue, and we agree, that the Act itself provides a better formula for discerning which state cases are preempted and which are not:
"Although the courts often have turned to the `indirectly' language of section 514(c)(2) in their analysis, they have largely ignored another critical word contained in the same clause. Section 514(c)(2) defines a `State' as an entity that `purports to regulate, directly or indirectly, the terms and conditions' of the plan.
"An inquiry into the significance of the word `purports' sheds considerable light on the elusive `relate to' language of section 514(a). `Purport' has two ordinary meanings: `to ... imply or profess outwardly' and `to have in mind.' Both meanings comprehend purposethe first speaks to apparent purpose, the second to actual purpose or intent. In the state law context, an apparent purpose to regulate, manifested by a reference to employee benefit plans in the text of the law, invariably reflects an actual regulatory purpose. Hence, any law expressly directed toward employee benefit plans `purports' to regulate the plans within the meaning of section 514.
"Congress meant to preempt such state laws, however, whether or not they are styled as employee benefit plan regulations. In light of this congressional intent, `purports' must be construed in its `normal sense' of `to have in mind.' This construction necessitates an inquiry into the actual legislative or judicial purpose underlying the state law in question. To determine whether the purpose of a state law is to regulate benefit plans, a court should identify what the law seeks to accomplish and ask whether the law presupposes the existence of benefit plans to achieve that aim. If the purpose of the law is to affect the terms and conditions of employee benefit plans, the law may be found to `relate to' the plans under section 514(a). If such a purpose is absent, the `relate to' requirement will not be met and the law will not be preempted, even though it may have some tangible effect on benefit plans.
"This purpose-effect distinction serves well to identify those state `legislative' laws that Congress intended to preempt with section 514. In addition, this approach is useful in determining whether section 514 preempts a state court or agency application of an otherwise valid state law to a benefit plan. In these adjudicative settings, a second `State Law' emerges that seeks to impose a provision of state law on the plan irrespective of the plan's terms. Such state adjudications invariably `purport' to regulate the plan and consequently should be preempted under section 514(a). State adjudicative decisions raise a different issue, however, when the decisions are grounded in the terms of the plan itself, rather than in the terms of the state law applied to the benefit plan. The question then arises whether this act of interepresentation itself constitutes a state law that `relates to' the plan. This problem is treated in the following subpart.
"Section 502(a)(1)(B) provides that a participant or beneficiary of a plan may bring a civil action `to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan....' Section 502(e)(1) provides that this civil action may be brought in either federal or state court. To reconcile this grant of concurrent jurisdiction with section 514's preemption of state laws that regulate the terms and conditions of a plan, state court decisions that merely interpret the terms of the plan in order to adjudicate the rights of a participant or beneficiary must be deemed not to *243 regulate the plan's terms and conditions. Any other conclusion would reduce the grant of concurrent jurisdiction to surplusage: decisions sanctioned by sections 502(a)(1)(B) and 502(e)(1) would be preempted by section 514.
"Thus, the jurisdictional sections of ERISA, by allocating authority to the state courts to interpret the terms of a plan, imply that interpretation alone does not constitute regulation of the terms and conditions of a plan. If interpretation is not regulation of the plan's terms when federal and state courts have concurrent jurisdiction, there is no basis for a different conclusion when the state court interprets the terms of a plan in a case over which only the state court has jurisdiction. Thus, although the states are barred from regulating employee benefit plans, they are invited to construe the plans' terms, a task that often entails construing ERISA's requirements. The states can, therefore, create decisional law, but they may not apply existing state law, decisional or otherwise, that overrides the terms of the plan."
Neither Alabama's fraud statute nor the common law action for fraud purports to regulate, directly or indirectly, the terms and conditions of a plan, and the application of Alabama's fraud law to the facts of this case does not relate to or affect the administration of the plan.
The analysis suggested by Kilberg and Inman would promote the policy endorsed by the United States Supreme Court in Ft. Halifax: "ERISA pre-emption analysis `must be guided by respect for the separate spheres of government authority preserved in our federalist system.'" 482 U.S. at 19, 107 S.Ct. at 2221, quoting Alessi v. Raybestos-Manhattan, Inc., supra. It is equally consistent with the Court's decision in Metropolitan Life Insurance Co. v. Massachusetts, where the Court stated: "We must also presume that Congress did not intend to preempt areas of traditional state regulation." 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).
The defendants argue that the trial court erred in allowing Menton to amend his complaint after final judgment was entered, to allege a violation of the "twisting" statute, § 27-12-6. The trial court did not err, for two reasons. The first is that every element underlying the "twisting" statute is included in the plaintiff's complaint stating a common law cause of action for fraud, now codified at § 6-5-101 (misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge). Therefore, the amendment to the complaint alleging violation of § 27-12-6 was redundant, and it could not have prejudiced the defendants in any way. Second, if it is assumed for purposes of argument, or if some other court decides that a claim under § 6-5-101 or its common law counterpart is preempted by section 514(a) of ERISA, then we would hold that a claim under § 27-16-6 could still be maintained under the saving clause of ERISA as a state law regulating the business of insurance:
"[N]othing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance...."
Section 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A).
The purpose of Chapter 12 ("Trade Practices Law") of Title 27 ("Insurance") of the Alabama Code is expressed in § 27-12-1(a):
"The purpose of this chapter is to regulate trade practices in the business of insurance in accordance with the intent of congress as expressed in the Insurance Regulation Act by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." (Emphasis added.)
Section 27-12-6 ("Twisting") provides as follows:
"No person shall make or issue, or cause to be made or issued, any written or oral statement misrepresenting or making misleading incomplete comparisons as to the terms, conditions, or benefits *244 contained in any policy for the purpose of inducing, or attempting or tending to induce, the policyholder to lapse, forfeit, surrender, retain, exchange or convert any insurance policy."
Section 27-1-2(3) defines "person" for the purposes of Title 27 as follows:
"An individual, insurer, company, association, organization, Lloyd's insurer, society, reciprocal insurer or interinsurance exchange, partnership, syndicate, business trust, corporation and every legal entity."
The United States Supreme Court in Pilot Life looked to "common sense" and to the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., in interpreting the saving clause, and in doing so it used the following criteria to determine whether a practice falls under the "business of insurance": "`[F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.'"
Pilot Life, 481 U.S. at 48-49, 107 S.Ct. at 1553-54, 95 L.Ed.2d at 48 (1987) (quoting Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982)) (emphasis in original). The legislature of Alabama, in adopting the "twisting" statute § 27-12-6, has enacted a fraud and misrepresentation statute that specifically relates to the insurance industry and, therefore, we believe it is "saved" from preemption by a proper enterpretation of § 514(b).
We acknowledge that the Eleventh Circuit Court of Appeals has held in Farlow v. Union Cen. Life Ins. Co., 874 F.2d 791 (11th Cir.1989), that the Alabama "twisting" statute does not create a private cause of action and that, if it did, a claim under it would be preempted under ERISA if the employer's conduct giving rise to the claim was not "wholly remote in content" from the benefit plan. Presumably, under this holding, the commissioner of insurance would be preempted from imposing the statutory sanctions against insurance companies that violate § 27-12-1 et seq. We are unconvinced that Congress intended this result.
We recognize that the cases from the various federal courts are disparate. We adopt the position taken by the Sixth Circuit on the precise issue involved in this case: fraud in the inducement. Perry v. P*I*E Nationwide, Inc., 872 F.2d 157 (6th Cir.1989). In that case, the plaintiffs alleged that the defendant had fraudulently induced them to participate in a plan covered by ERISA. The defendants claimed preemption under § 514(a). The district court held that "preemption by ERISA applies only once the benefit plan is in existence" and does not apply to alleged common law actions of fraud or misrepresentation "to get the plaintiffs to join the plan." Because the purported misconduct of P*I*E occurred before the plaintiffs became participants or beneficiaries, and because they were not suing for benefits under the plan, the district court had held that preemption did not apply. In accord, Butler v. Fringe Benefits Plan, Inc., 701 F.Supp. 804 (N.D. Ala.1988).
The Circuit Court of Appeals for the Sixth Circuit affirmed, citing Miller v. Lay Trucking Co., 606 F.Supp. 1326 (N.D.Ind. 1985) (holding that the plaintiff's common law action for fraudulent inducement was not preempted by ERISA because the fraud occurred prior to the time the plaintiff entered the plan, and because the fraud claim did not directly affect the regulation of the ERISA plan).
The Sixth Circuit acknowledged, as we do, that there is respectable authority for the positions taken by both sides concerning preemption of state common law claims of fraud, etc.[1] It adopted in Perry the position expressed in Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208 (8th Cir.), cert. denied, 454 U.S. 968, 102 S.Ct. *245 512, 70 L.Ed.2d 384 (1981), that preemption should apply to a state law claim only if Congress has provided a remedy for the wrong or wrongs asserted.
Congress has not provided a remedy for the wrong asserted by Mr. Menton, and we are loath to imply an intent on its part to do so.
We next address the defendants' contention that the trial court erred in denying the defendants' motion for a mistrial based upon alleged improper argument by plaintiff's counsel. The defendants claim that the plaintiff's counsel improperly aroused the passion and prejudice of the jury against the defendants. The plaintiff claims that the jury verdict is the result of the overwhelming evidence of fraud, cover-up, and conspicuously selective memories that was introduced at the trial of the case. We have repeatedly held that in fraud actions "great latitude is allowed in the scope of evidence introduced." Simmons Mach. Co. v. M & M Brokerage, Inc., 409 So.2d 743, 756 (Ala.1981). The reason for allowing such latitude is that the perpetrator of a fraud is often the sole possessor of the actual knowledge of fraud. Sessions Co. v. Turner, 493 So.2d 1387, 1391 (Ala.1986).
Questions of materiality, relevancy, and remoteness of evidence are matters resting within the discretion of the trial court, whose exercise of that discretion will not be reversed unless it has been grossly abused. Dorcal, Inc. v. Xerox Corp., 398 So.2d 665, 670-71 (Ala.1981). This discretion extends to argument of counsel. We have said:
"The control of arguments rests largely in the discretion of the trial court, before whom the argument is made, and who sees and can judge the demeanor of the counsel making the argument, and who can determine whether a prejudicial atmosphere is created by such remarks; therefore, we will not interfere where this discretion is not abused."
Southern Ry. Co. v. Jarvis, 266 Ala. 440 at 446, 97 So.2d 549 (1957), in accord, Old Southern Life Ins. Co. v. Woodall, 348 So.2d 1377 (Ala.1977).
Counsel may state or comment upon all evidence admitted at trial and draw inferences and conclusions from that evidence. Seaboard Coastline R.R. v. Moore, 479 So.2d 1131 (Ala.1985). This Court has established a standard of review on claims for improper argument whereby we will not reverse unless substantial prejudice has resulted. Id., at 1136. In denying defendants' motion for a JNOV, new trial, and remittitur, the trial court stated: "[T]he court cannot call to mind [nor] have the attorneys for the defendants shown to the court any factor at all that could be construed to indicate bias, passion, prejudice, corruption, or other improper motive or cause on the part of the jury."
We recently affirmed a trial court's refusal to grant a mistrial, under circumstances similar to the present case, in which there was a reference to the wealth of the defendants. We observed that the court heard the remark in context, witnessed the effect upon the jury, and was able to make a better judgment than we were as to whether the remark was improper argument and might have prejudiced the jury. L.W. Johnson & Assoc., Inc. v. Rivers Construction Co., 532 So.2d 618 at 625 (Ala.1988). We have carefully examined the record in this case and find no error by the trial judge, who had the opportunity to judge the demeanor of counsel and who could determine whether his remarks created a prejudicial atmosphere.
The defendants also claim that the trial court erred in charging the jury. The jury asked: "Are the defendants `the corp. and Pam' or `the corp. or Pam?'" The judge replied:
"THE COURT: Well, for your purposes it doesn't make any difference. I mean the corporation is fully responsible for the acts of its agents, so it doesn't make any difference. I mean, you know, we're concernedyou know, the representations are the representations of the agent. I mean, I don't think Iis that
"JUROR: That's what we needed to know."
Defendants admit that the trial court correctly instructed the jury that a corporation *246 is responsible for the acts of its agent. We find no error in so instructing the jury.
Defendants contend that the trial court erred in refusing to submit special verdict questions to the jury and in charging the jury as to reckless fraud. Under Rule 49, Ala.R.Civ.P., the use of a special verdict is within the sound discretion of the trial court. After instructing the jury on willful misrepresentation, based on the Alabama Pattern Jury Instructions, the trial court charged the jury on the definition of reckless misrepresentation as follows:
"A reckless misrepresentation which is also actionable [sic]; the law says that if you are reasonably satisfied from the evidence that the defendant misrepresented a material fact recklessly without knowledge of the truth or the falsity thereof and with the intent to induce the plaintiff to act and that the plaintiff acted upon said reckless misrepresentation to his injury, then the defendant is also guilty of a legal fraud under those circumstances.
"If the plaintiff has not proved the case of fraud through either an intentional or a reckless misrepresentation as I just described to you, you would go no further. Your verdict would be for the defendant." [R. 295-96.]
One of the Alabama pattern jury instructions defines "reckless misrepresentation" as follows:
"If you are reasonably satisfied from the evidence that the defendant misrepresented a material fact recklessly without knowledge of the truth or falsity thereof and with the intent to induce plaintiff to act and that plaintiff acted upon said reckless misrepresentation to his injury, then defendant is guilty of a legal fraud."
Alabama Pattern Jury Instructions (Civil), Instruction 18.02, p. 270.
During jury deliberations, the jury had a question. The trial court asked the foreman: "You want me to define a reckless misrepresentation?" The foreman replied: "Yes, Sir." To this the trial judge responded:
"If you are reasonably satisfied from the evidence that the defendants misrepresented a material fact recklessly without knowledge of the truth or falsity and with the intent to induce the plaintiff to act, and the plaintiff did act upon the reckless misrepresentation to his injury, then the defendant is guilty of a legal fraud." [R. 306]
The trial court gave the identical definition of reckless misrepresentation both during his oral charge and after the jury's question. In doing so, he correctly charged the jury.
The defendants also contend that the court's charge on punitive damages in a fraud case constitutes reversible error. The longstanding rule of this Court is as follows:
"[P]unitive damages may be recovered in a fraud action if the fraudulent misrepresentation was malicious, oppressive, or gross, or made with knowledge of its falsity or so recklessly as to amount to the same thing or was made with the purpose of injuring the plaintiff."
Curry Motor Co. v. Hasty, 505 So.2d 347 (Ala.1987). See: Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala. 1985).
In the present case, the trial judge instructed the jury in his oral charge as follows:
"[T]he law says that you are authorized to award punitive damages in a fraud action if it is shown to your reasonable satisfaction from the evidence that the fraud was malicious, oppressive, or gross, or a misrepresentation was made with the knowledge of its falseness or so recklessly done as to amount to the same thing and committed with the intent to injure and to defraud." [R. 296-97.]
The jury had a question on the meaning of reckless fraud during its deliberations. The trial court further instructed the jury as follows:
"I just want to clarify one thing, ladies and gentlemen, I want to clarify this: the definition I just read you would authorize if the plaintiff proved it, to recover *247 actual damages. With respect to recovering punitive damage, the law says that the fraud must be malicious, oppressive or gross or made with knowledge of the falseness of the representation or so recklessly done as to amount to the same thing and committed with the intent to injure and defraud."
The trial court did not err in charging the jury.
The defendants argue that the trial court erred in denying their motions for directed verdict, judgment notwithstanding the verdict, and a new trial based upon the insufficiency of the evidence of either intentional or reckless fraud. We have carefully reviewed the record in this case. The record supports the decision of the trial judge.
The defendants argue that the award of punitive damages violates the Constitution of Alabama and the Constitution of the United States of America. They argue that the jury verdict of $1,797,588 in punitive damages is based upon only $2,412 in compensatory damages. However, the defendants did not raise any constitutional question prior to filing their motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial or for a remittitur. Although the trial judge, in his order of June 13, 1988, states that the defendants' challenges to the constitutionality of the award of punitive damages "were timely raised and effectively presented," in fact, these issues were not raised until 29 days after the trial court had entered judgment on the jury's verdict.
It is settled law that constitutional issues must be raised before the trial court in order to be preserved for review upon appeal. Marion v. Hall, 429 So.2d 937 (Ala. 1983); Talley v. A & M Construction Co., 284 Ala. 371, 373, 225 So.2d 359, 360 (1969), cert. denied, 397 U.S. 995, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970); Hicks v. Huggins, 405 So.2d 1324 (Ala.Civ.App.), cert. denied, 405 So.2d 1328 (Ala.1981). We have declined previously to consider similar issues because "these challenges were not presented for resolution before the trial court and [were] presented for the first time on appeal." Nationwide Mutual Ins. Co. v. Clay, 525 So.2d 1339, 1344 (Ala.1987), cert. denied, ___ U.S. ___, 109 S.Ct. 863, 102 L.Ed.2d 988 (1989). Thus, the defendants did not preserve their constitutional issues for appeal. However, we would be remiss if we neglected to note that the United States Supreme Court has recently ruled in the case of Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., ___ U.S. ___, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) that the excessive fines clause of the Eighth Amendment does not apply to punitive damages awards in cases between private parties. In doing so, the Supreme Court upheld an award of $6 million in punitive damages when the compensatory damages were $51,146.
Finally, the defendants claim that the verdict of the trial court was excessive and should be set aside.
With respect to the question of a remittitur, it is within the authority of this Court to order a remittitur, pursuant to Code of Alabama (1975), § 12-22-71, if it finds the judgment to be excessive. The rules that govern this Court's review of a verdict claimed to be excessive were set out in Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (1963):
"`The rules governing our consideration of this question are clear and have been reiterated quite often. We refer to them briefly for emphasis: The verdict of a jury should not be interfered with merely because in the opinion of the court the jury gave too little or too much...; and the authority vested in the courts to disturb a verdict of the jury on the ground of excessive damages is one which should be exercised with great caution ...; where there is no set standard for the admeasurement of the damages but the damages to be awarded are left to the sound discretion of the jury, a remittitur or a new trial should not be ordered on the ground of excessiveness of the jury's verdict except in those cases where the court can clearly see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive or cause ...; but *248 where the damages allowed are so excessive as to warrant the belief that the jury must have been misled by some mistaken view of the merits of the case the court may interfere and set the verdict aside...; also, where the trial court refuses to grant a new trial because [it] does not believe the verdict to be excessive, the favorable presumption attending the jury's verdict is thereby strengthened....'"
(As quoted in Black Belt Wood Co., Inc. v. Sessions, 514 So.2d 1249, at 1264-65 (Ala. 1986).)
The trial court issued an order denying defendants' motion for a remittitur, and in it the trial judge expressly acknowledged that he had carefully considered all of the evidence on all issues. The trial judge noted that a remittitur or new trial is proper "where the court can clearly see that the verdict is tainted by bias, passion, prejudice, corruption, or other improper motive or cause on the part of the jury." The trial judge stated in his order as follows:
"The Court has carefully considered all of the evidence in the case on all issues. The Court has carefully considered the nature and quality of the testimony of all of the witnesses, as well as the demeanor of each witness while testifying. The Court has further reviewed its Charge to the jury on the issue of damages and has found that it correctly instructed the jury on damages. As a part of the charge, the jury was instructed that if they found in favor of the Plaintiff, Edward Menton, and against the Defendants, HealthAmerica and Pamela Merle, that in assessing damages they should take into consideration and give due regard to the enormity of the wrong and the necessity of preventing similar wrongs in the future.
"After a careful review by the Court of the entire trial of the case, including the testimony of all of the witnesses, all of the documentary and demonstrative evidence produced at trial, the Court's observation of all parties and witnesses, and the Court's charge to the jury on damages, the Court is convinced that the jury carefully and conscientiously followed the Court's instructions in assessing damages in the case at $1,800,000.00 and that the award is consistent with the Court's instructions and supported by the evidence.
"This Court finds, after a review of the entire trial, that the central issue presented in the Defendants' motion for remittitur is whether or not the jury verdict of $1,800,000.00 in this case is, in and of itself, evidence of bias, passion, prejudice, corruption or other improper motive or cause. The Court cannot call to mind [nor] have the attorneys for the Defendants shown to the Court any factor at all that could be construed to indicate bias, passion, prejudice, corruption, or other improper motive or cause on the part of the jury. On the contrary, the Court finds that there was clear and convincing evidence of fraud on the part of the Defendants, HealthAmerica and Pamela Merle, which in the Court's opinion fully justified the jury's verdict.
"The Court finds that the $1,800,000.00 verdict is not excessive and is not the result of bias, passion, prejudice, corruption, or other improper motive or cause."
We have reviewed this order of the trial judge, and we find that he followed the guidelines we have previously adopted to be used by a trial court in reviewing judgments. Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Harmon v. Motors Ins. Corp., 493 So.2d 1370 (Ala.1986); Alabama Farm Bureau Mutual Cas. Ins. Co. v. Griffin, 493 So.2d 1379 (Ala.1986). The trial judge applied the principles of law adopted in those cases, held a hearing, and set forth the reasons why he felt that the law did not authorize him to order a remittitur.
We have examined the record in the light of our rules as to remittitur. We are of the opinion that the judgment of the trial court, including the damages award, which the trial court reviewed on motion for JNOV, for a new trial, and for remittitur, is due to be, and it is hereby is, affirmed.
AFFIRMED.
*249 HORNSBY, C.J., and JONES, ADAMS, STEAGALL and KENNEDY, JJ., concur.
MADDOX and HOUSTON, JJ., dissent, with opinion by HOUSTON, J.
HOUSTON, Justice (dissenting).
The second paragraph in Article VI, of the Constitution of the United States, provides:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (Emphasis supplied.)
If I were writing on a clean slate, freed from the deference that I do and must give to the opinions of the United States Supreme Court, I could reach the result reached by the majority of this Court in this case, on the preemption issue, for I would adopt the "purpose-effect" and "regulation-interpretation" distinctions suggested as an alternative approach to the "relate to" requirement by William J. Kilberg's and Paul D. Inman's article Preemption of State Laws Relating to Employee Benefit Plans: An Analysis of ERISA Section 514, 62 Tex.L.Rev. 1313, 1328-30 (1984). However, I have given my solemn oath to uphold the Constitution of the United States, and that includes the second paragraph of Article VI; therefore, I must dissent.
Justice O'Connor, in delivering the opinion for a unanimous Court in Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 44-46, 107 S.Ct. 1549, 1551-52, 95 L.Ed.2d 39 (1987), wrote:
"In ERISA, Congress set out to
"`protect ... participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.' § 2, as set forth in 29 U.S.C. § 1001(b).
"ERISA comprehensively regulates, among other things, employee welfare benefit plans that, `through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability or death. § 3(1), 29 U.S.C. § 1002(1).
"Congress capped off the massive undertaking of ERISA with three provisions relating to the pre-emptive effect of the federal legislation:
"`Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....' § 514(a), as set-forth in 29 U.S.C. § 1144(a) (pre-emption clause).
"`. . . .'
". . . .
"`[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent. "`The purpose of Congress is the ultimate touchstone.'"' Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985), quoting Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978), quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). We have observed in the past that the express pre-emption provisions of ERISA are deliberately expansive, and designed to `establish pension plan regulation as exclusively a federal concern.' Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). As we explained in Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983):
"`The bill that became ERISA originally contained a limited pre-emption *250 clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected those provisions in favor of the present language, and indicated that section's pre-emptive scope was as broad as its language. See H.R.Conf.Rep. No. 93-1280, p. 383 (1974); S.Conf.Rep. No. 93-1090, p. 383 (1974).'" (Emphasis supplied.)
In Kilberg and Inman's Preemption of State Laws Relating to Employee Benefit Plans: An Analysis of ERISA Section 514, 62 Tex.L.Rev. 1313, 1315-16, the following appears:
"Express preemption provisions such as section 514 must be distinguished from the implied preemption that arises from the supersession inherent in antithetical federal and state commands or from the encroachment of state law into a field occupied by comprehensive federal regulation or interests. To strike down a state law in an implied preemption case, the court must find either a specific conflict between federal and state commands or a clash between zones of sovereign interest. The goal of an implicit preemption analysis should be to accommodate the federal interest with the least possible displacement of state law. The goals of an express preemption analysis, in contrast, should be to prevent subtle or incremental state encroachment into a field that Congress has chosen expressly to reserve for federal law. Yet, courts have mistakenly applied preemption doctrines fashioned in implied preemption cases to section 514 cases, in which the issue is whether the federal lawby its express terms preempts the state law in question. Once Congress has declared its express intent to preempt or to save a state law, it has largely obviated judicial inquiry into considerations other than those concerning the text of the preemption provision." (Emphasis supplied.)
"[A]ny and all State laws insofar as they may now or hereafter relate to any employee benefit plan," subject to certain exceptions that will be discussed later, is what Congress expressly preempted. 29 U.S.C. § 1144(a). "The term `State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law...." 29 U.S.C. § 1144(c). Does this preempt a civil action by Menton, who is a "participant" (29 U.S.C. § 1002(7)) and a "party in interest" (29 U.S.C. § 1002(14)) for an intentional or reckless misrepresentation by HealthAmerica, which is a "party in interest" (29 U.S.C. § 1002(14)) as to the medical coverage benefits provided by a particular employee benefit plan?
Medical coverage benefits are benefits that "accumulate over a period of time and are payable only upon the occurrence of a contingency outside of the control of [Menton];" therefore, they are "risks that ERISA is intended to address," Massachusetts v. Morash, ___ U.S. ___, 109 S.Ct. 1668, 1669, 104 L.Ed.2d 98 (1989). Likewise, the phrase "relate to" has been given its broad commonsense meaning, so that a state law relates to an employee benefit plan "if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983); Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); Pilot Life Ins. Co. v. Dedeaux, supra. In this case, the representation was made by a party in interest as to an employee benefit plan to a party in interest as to that same employee benefit plan concerning medical benefits payable under that employee benefit plan. Clearly, the representation related to the employee benefit plan, as "related to" is defined by the United States Supreme Court.
In Pilot Life Ins. Co. v. Dedeaux, supra, Dedeaux's complaint contained three counts: "`tortious breach of contract'"; "`breach of fiduciary duties'"; and "`fraud in the inducement.'" (Emphasis supplied.) 481 U.S. at 43, 107 S.Ct. at 1551. At the close of discovery, Pilot Life moved for summary judgment, arguing ERISA preemption. The district court entered summary judgment; the Court of Appeals for the Fifth Circuit reversed; the United States Supreme Court granted certiorari *251 and reversed the Fifth Circuit and reinstated the summary judgment for Pilot Life. In Belasco v. W.K.P. Wilson & Sons, Inc., 833 F.2d 277 (11th Cir.1987), the Eleventh Circuit Court of Appeals held that Alabama state law claims of bad faith and fraud (which a review of the amended complaint in Belasco shows to be remarkably similar to the fraud alleged in the case at issue) of a plaintiff, who was a "participant" and a "party in interest" as to an employee benefit plan against an insurance company that was a "party in interest" as to that employee benefit plan related to the plan and were pre-empted.
The facts in Davidian v. Southern California Meat Cutters Union & Food Employees Benefit Fund, 859 F.2d 134 (9th Cir.1988), are similar to the facts in the case at issue. Davidian, a "participant" and "party in interest" as to an employee benefit plan, alleged that he was planning to retire and that the plan gave him a choice of one of three benefits programs. A "party in interest" as to the plan described the third option as paying "approximately 80%" of major medical coverage, like plaintiff's prior coverage, but did not inform the plaintiff that, unlike his prior coverage, reimbursement for major medical expenses under the third option was capped at $20,000.00. The plaintiff enrolled in the third option and subsequently underwent heart surgery. The plan refused to pay plaintiff's medical expenses in excess of $20,000.00. Davidian filed suit against the plan for fraud and deceit. The Ninth Circuit held that Davidian's claims were preempted and addressed Davidian's contention that claims for future benefits, as distinguished from past benefits, are not preempted, as follows:
"There is no reason for such a distinction based on the purpose of the preemption provisions of the Act. The potential for conflicting and inconsistent state and local regulation of employee benefit plans is as real whether past or future benefits are involved."
859 F.2d at 135.
This Court held that the bad faith refusal to pay insurance benefits under an employee benefit plan by a party in interest as to an employee benefit plan to a party in interest as to that same employee benefit plan did not relate to the plan and was not preempted by ERISA. Hood v. Prudential Ins. Co. of America, 460 So.2d 1227 (Ala. 1984). After the United States Supreme Court decided Massachusetts Mutual Life Insurance Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), and Pilot Life Ins. Co. v. Dedeaux, supra, we reversed ourselves and held that Hood's bad faith claim was preempted. Hood v. Prudential Ins. Co. of America, 522 So.2d 265 (Ala.1988). Having had our judicial flexibility rendered rather rigid by our federalist system, we have ruled in favor of ERISA preemption of common law causes of action. See, Landy v. Travelers Insurance Co., 530 So.2d 214 (Ala.1988); Hood v. Prudential Ins. Co. of America, 522 So.2d 265 (Ala.1988); and Seafarers' Welfare Plan v. Dixon, 512 So.2d 53 (Ala.1987).
Justice O'Connor in Pilot Life, supra, wrote:
"The Solicitor General, for the United States as amicus curiae, argues that Congress clearly expressed an intent that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits, and that varying state causes of action for claims within the scope of § 502(a) would pose an obstacle to the purposes and objectives of Congress. Brief for United States as Amicus Curiae 18-19. We agree. The conclusion that § 502(a) was intended to be exclusive is supported, first, by the language and structure of the civil enforcement provisions, and second, by legislative history in which Congress declared that the pre-emptive force of § 502(a) was modeled on the exclusive remedy provided by § 301 of the Labor-Management Relations Act (LMRA), 61 Stat. 156, 29 U.S.C. § 185.
"The civil enforcement scheme of § 502(a) is one of the essential tools for accomplishing the stated purposes of ERISA. The civil enforcement scheme is sandwiched between two other ERISA *252 provisions relevant to enforcement of ERISA and to the processing of a claim for benefits under an employee benefit plan. Section 501, 29 U.S.C. § 1131, authorizes criminal penalties for violations of the reporting and disclosure provisions of ERISA. Section 503, 29 U.S.C. § 1133, requires every employee benefit plan to comply with Department of Labor regulations on giving notice to any participant or beneficiary whose claim for benefits has been denied, and affording a reasonable opportunity for review of the decision denying the claim."
481 U.S. at 52-53, 107 S.Ct. at 1555-1556. (Emphasis supplied.)
In view of this policy, I cannot see how civil actions for bad faith in processing claims for benefits under ERISA plans are preempted and civil actions for misrepresentations made by a "party in interest" to a "party in interest/participant" concerning the coverage under ERISA plans are not, and, indeed, they have been so preempted in most cases since Pilot Life, supra. See, i.e., Pilot Life (fraud in the inducement); Belasco (misrepresentation of benefits payable under an ERISA plan); Davidian (misrepresentation of benefits payable under an ERISA plan). I have studied all of the cases cited in the majority opinion, in briefs, and at oral argument by the parties, and I do not believe that an analysis of each case would be helpful to the bench or bar. Contrary to what the majority contends, I believe that the weight of authority of cases decided since Pilot Life, supra, supports my conclusion.
Reluctantly, I would hold Menton's claim to be related to the Press Register's employee benefit plan and preempted by ERISA on authority of Shaw v. Delta Air Lines, supra; Metropolitan Life Ins. Co. v. Massachusetts, supra; Pilot Life Ins. Co. v. Dedeaux, supra; Belasco v. W.K.P. Wilson & Sons, Inc., supra; and Davidian v. Southern California Meat Cutters Union & Food Employees Benefit Fund, supra.
I am not persuaded that civil actions for bad faith or fraud have anything to do with regulation of employee benefit plans or that the purpose for such actions is to affect the terms and conditions of employee benefit plans. However, I believe that this has been decided otherwise by a higher court; and I cannot justify holding that Menton's cause of action does not "relate to" an employee benefit plan in order to save it from pre-emption, when the causes of action asserted in Pilot Life, supra, for tortious breach of contract and fraud in the inducement and the causes of action asserted in Belasco, supra, for bad faith and fraud were held to "relate to" employee benefit plans and therefore to be preempted. To so hold would be to make a distinction without a difference.
Is Menton's cause of action exempted from preemption under 29 U.S.C. § 1144(b)(2)(A)? That statute reads:
"[N]othing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance...."
The trial court indicated that it was not granting HealthAmerica's and Merle's motions for directed verdict, because the HMO statutes and the Alabama "twisting" statute were laws regulating insurance and, under the evidence, could be the basis of Menton's cause of action. Prior to final judgment, Menton's complaint did not mention or purport to be brought under either statute.
The HMO statutes did not become effective until May 29, 1986, almost a year after Menton's cause of action accrued. As a general rule, statutes, except remedial statutes, will not be construed to have retroactive effect unless the language of the statute expressly indicates that the Legislature so intended. Jones v. Casey, 445 So.2d 873 (Ala.1983). There is no expression of legislative intent that the HMO statutes apply to causes of action that accrued prior to the effective date of that legislation. This Court defined remedial statutes in Street v. City of Anniston, 381 So.2d 26, 29 (Ala. 1980), as "those relating to remedies or modes of procedure, which do not create new rights or take away vested ones." For Menton's cause of action to be saved from preemption by the HMO statutes, the statutes *253 would have to regulate insurance and give him a new private cause of action. A statute creating a new right, a new cause of action, is clearly substantive in nature and would not be given retroactive application in the absence of a provision indicating a contrary legislative intent. I need not address whether the HMO statutes create a private cause of action, for if they do they will not be given retroactive effect. Therefore, I need not discuss whether the Alabama HMO statutes "regulate insurance," for Menton's cause of action for misrepresentation is not saved from preemption by the HMO statutes.
The purpose for Chapter 12 ("Trade Practices Law") of Title 27 ("Insurance") is expressed in § 27-12-1(a):
"The purpose of this chapter is to regulate trade practices in the business of insurance in accordance with the intent of congress as expressed in the Insurance Regulation Act by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined."
Section 27-12-6 ("Twisting") provides:

"No person shall make or issue, or cause to be made or issued, any written or oral statement misrepresenting or making misleading incomplete comparisons as to the terms, conditions or benefits contained in any policy for the purpose of inducing, or attempting or tending to induce, the policyholder to lapse, forfeit, surrender, retain, exchange or convert any insurance policy." (Emphasis supplied).
Section 27-1-2(3) defines "person" for the purposes of Title 27 as follows:
"An individual, insurer, company, association, organization, Lloyd's insurer, society, reciprocal insurer or interinsurance exchange, partnership, syndicate, business trust, corporation and every legal entity."
Section 27-1-2(2) defines "insurer" for the purposes of Title 27 as follows:
"Every person engaged as indemnitor, surety or contractor in the business of entering into contracts of insurance."
In Pilot Life, supra, Dedeaux did not contend that his cause of action for fraud in the inducement was a law that regulated insurance and was thus saved from preemption, so this was not discussed by Justice O'Connor in her opinion. Dedeaux did contend that the cause of action for bad faith did regulate insurance and was saved from preemption by § 514(b)(2)(A). In regard to this, Justice O'Connor wrote that the Court first took "what guidance was available from a `common-sense view' of the language of the saving clause itself." 481 U.S. at 48, 107 S.Ct. 1553 ("any law of any State which regulates insurance"). "Second," she wrote, "we made use of the case law interpreting the phrase `business of insurance' under the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., in interpreting the saving clause"; and, she noted that in doing so the Court used these criteria:
"`[F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.'"
481 U.S. at 48-49, 107 S.Ct. at 1553-54 (quoting Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982) (emphasis in original).
In applying the "common sense view," Justice O'Connor reasoned that the phrase "regulates insurance" does not support the argument that the Mississippi law of bad faith falls under the saving clause, since the Mississippi Supreme Court, as early as 1915, had recognized that punitive damages were available in a contract case when "`the act or omission constituting the breach of [any contract, not just an insurance] contract amounts also to the commission of a tort.'"
"Certainly a common-sense understanding of the phrase `regulates insurance' *254 does not support the argument that the Mississippi law of bad faith falls under the saving clause. A common-sense view of the word `regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but be specifically directed toward that industry. Even though the Mississippi Supreme Court has identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law."
481 U.S. at 50, 107 S.Ct. at 1554.
The Alabama "twisting" statute appears to be directed toward the insurance industry. However, since 1907, the Alabama Legislature has provided a civil action for "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge." § 6-5-101. The Alabama Supreme Court, at least since 1933, has allowed punitive damages to be recovered in such misrepresentation actions, when the misrepresentations were made by the defendant with the intent to defraud the plaintiff. Cartwright v. Hughes, 226 Ala. 464, 147 So. 399 (1933). So the roots of misrepresentation were firmly planted in the general principles of Alabama tort law, before the Legislature enacted the "twisting" statute in 1971. Until the post-final judgment amendment of his complaint, Menton had pursued his civil action against HealthAmerica and Merle under this firmly planted general principle of Alabama tort law.
In Pilot Life, supra, the United States Supreme Court found that the factors set out in the McCarran-Ferguson Act did not support Dedeaux's assertion that the Mississippi law of bad faith "regulates insurance," for (1) it did not affect a spreading of policyholder risk; (2) "[t]he state common law of bad faith is ... no more `integral' to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State." 481 U.S. at 51, 107 S.Ct. at 1555; and (3) "Mississippi's law of bad faith, even if associated with the insurance industry, has developed from general principles of tort and contract law available in any Mississippi breach of contract case." 481 U.S. at 51, 107 S.Ct. at 1555. The Court then held "the Mississippi common law of bad faith at most meets one of the three criteria used to identify the `business of insurance' under the McCarran-Ferguson Act, and used in Metropolitan Life to identify laws that `regulat[e] insurance' under the saving clause."
I do not find that the "twisting" statute affected a spreading of the risks among policyholders; or that the "twisting" statute is more integral to the insurer-insured relationship than Alabama's misrepresentation statute, as developed from general principles of tort law; or that the statute in its definition of "person" and "insurer" is limited to entities in the insurance business.[2] Therefore, using Justice O'Connor's criteria for determining when a state law "regulates insurance" and is therefore saved from ERISA preemption, I would find that the "twisting" statute does not save Menton's claim from preemption. By this, I do not mean to imply that Alabama's "twisting" statute affords a private cause of action to Menton.[3] I need not reach this issue.
*255 A unanimous United States Supreme Court in Pilot Life, supra, held that Dedeaux's state law claims, including bad faith and fraud in the inducement, were preempted, even though Dedeaux elected not to assert any of the remedies that would be available under ERISA. Menton elected not to assert any of the remedies that would be available to him under ERISA, i.e., to clarify and enforce his rights under the terms of the plan as represented to him, and to obtain equitable relief (reformation of the health insurance contract to remove the time limitation on physical therapy and orthopedic appliances benefits), etc. 29 U.S.C. § 1132(a). These benefits and an award of attorney fees could have been available to Menton under ERISA, whether he sued in federal or in state court, if he had prevailed on his ERISA claim. Pilot Life, 481 U.S. at 53, 107 S.Ct. at 1556. Therefore, ERISA did not deny Menton a remedy. At the conclusion of Pilot Life, 481 U.S. at 57, 107 S.Ct. at 1558, Justice O'Connor wrote:

"Metropolitan Life [Ins. Co. v. Massachusetts, supra], did not involve a state law that conflicted with a substantive provision of ERISA. Therefore the Court's general observationthat state laws related to ERISA may also fall under the saving clausewas not focused on any particular relationship or conflict between a substantive provision of ERISA and a state law. In particular, the Court had no occasion to consider in Metropolitan Life the question raised in the present case: whether Congress might clearly express, through the structure and legislative history of a particular substantive provision of ERISA, an intention that the federal remedy provided by that provision displace state causes of action....
"Considering the common-sense understanding of the saving clause, the McCarran-Ferguson Act factors defining the business of insurance, and, most importantly, the clear expression of congressional intent that ERISA's civil enforcement scheme be exclusive, we conclude that Dedeaux's state law suit asserting improper processing of a claim for benefits under an ERISA-regulated plan is not saved by § 514(b)(2)(A), and therefore is pre-empted by § 514(a)."
This action was filed while Hood v. Prudential Ins. Co. of America, supra (Hood I), was the law. Prior to final judgment in this case, the United States Supreme Court decided Pilot Life, supra, and we decided Seafarers' Welfare Plan v. Dixon, supra. However, it was after final judgment in this case that this Court reversed Hood v. Prudential Ins. Co. of America, supra (Hood II) and decided Landy v. Travelers Insurance Co., supra. Therefore, I would reverse the judgment of the trial court; however, rather than rendering judgment or remanding with instructions that the trial court grant HealthAmerica and Merle's motion for JNOV, I would reverse and remand and afford Menton the opportunity to amend to state a claim under ERISA.
At the time this complaint was filed, Menton had every reason to believe, every reason to predict, that his state law cause of action asserting misrepresentation of coverage afforded by a health insurance plan would not be preempted by ERISA. See Hood I. During the course of this litigation in the circuit court and during this appeal, the rules were changed. This Court could not and did not predict this. See Hood I.
I, as a member of the Supreme Court of Alabama, will not thwart an opportunity for a remedy for one whose right to a particular remedy was foreclosed only by his astute attorneys' not being able to guess how Justices would rule. It seems appropriate and altogether just to invoke equitable relief, which is afforded by 29 U.S.C. § 1132(a)(3), to one whose civil cause of action was foreclosed by an expansion of the ERISA preemption after that cause of action had accrued and after an action to enforce it had been filed. See, Culberson v. Bankers Life Co., 541 So.2d 480 (Ala. 1989).
I would reverse and remand to permit Menton to amend and proceed with a cause *256 of action under ERISA, 29 U.S.C. § 1132(a). Therefore, I dissent.
MADDOX, J., concurs.
NOTES
[1] Cefalu v. B.F. Goodrich Co., 871 F.2d 1290 (5th Cir.1989); Cantrell v. Great Republic Ins. Co., 873 F.2d 1249 (9th Cir.1989); Straub v. Western Union Telegraph Co., 851 F.2d 1262 (10th Cir. 1988); Hermann Hosp. v. Meba Medical & Benefits Plan, 845 F.2d 1286 (5th Cir.1988).
[2] Alabama Code 1975, § 27-12-24, provides:

"No insurer shall, without just cause, refuse to pay or settle claims arising under coverages provided by its policies in this state...." (Emphasis supplied.)
From the pleadings in Belasco v. W.K.P. Wilson & Son, Inc., supra, we cannot determine whether this Code section, which is contained in Chapter 12 ("Trade Practices Law") of Title 27 ("Insurance") was relied on by Belasco as a law regulating insurance.
"Plaintiffs argue that the Alabama law of bad faith, which forms the basis of one of their claims, is a `law ... which regulates insurance,' 29 U.S.C. § 1144(b)(2)(A), and therefore falls under the saving clause. However, the Alabama law of bad faith appears to us to have the same roots `in the general principles of ... tort and contract law' as was the case in Dedeaux."
833 F.2d at 281.
[3] In Farlow v. Union Cent. Life Ins. Co., 874 F.2d 791 (11th Cir.1989), the Eleventh Circuit Court of Appeals held that the Alabama twisting statute does not create a private cause of action.